**UNITED STATES of America**

**v.**

**Eugene A. SCHAPPEL, a/k/a Eugene A. Schoppel, Appellant.**

**No. 23550.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 2, 1970.

Decided June 3, 1971.

Wilbur K. Miller, Senior Circuit Judge, concurred in result only.

---

4. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

Mr. James F. Bromley, Washington, D.C. (appointed by this Court) for appellant. Mr. Russell S. Bernhard, Washington, D. C. (appointed by this Court) was on the brief, for appellant.

Mr. Robert J. Higgins, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry and Daniel Harris, Asst. U. S. Attys., were on the brief, for appellee. Mr. William S. Block, Asst. U. S. Atty., also entered an appearance for appellee.

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and WILKEY, Circuit Judge.

BAZELON, Chief Judge:

▉ Appellant was convicted of robbery and assault with a dangerous weapon. He waived a jury trial, and stipulated that he had committed the acts charged, contesting only the issue of criminal responsibility.[1] Conflicting evidence on that issue was presented to the judge, who set forth his evaluation of the evidence in a memorandum opinion explaining the basis for his decision.[2] Appellant now contends that the opinion shows that the judge rejected the testimony of a principal defense witness for an arbitrary and impermissible reason. While we find the question somewhat troublesome, we are persuaded that on the facts of this case there was no error, and consequently we affirm the judgment below.

Prior to trial, Mr. Schappel's mental condition was explored in some detail. He was initially committed to St. Elizabeths Hospital for a mental examination in April of 1968, two months after the acts in question occurred.[3] At that time Dr. Blum, the staff psychologist, administered a battery of psychological tests; Dr. Kunev, a staff psychiatrist, interviewed him; the ward attendants kept him under routine daily observation; and finally he was interviewed at a diagnostic staff conference by Dr. Kunev and Dr. Platkin, acting director of the maximum security division of the Hospital.

The psychologist found in Mr. Schappel's test responses the indications of serious mental illness.[4] Initially Dr. Kunev shared that view, largely on the ba-

1. In United States v. Brown, 138 U.S.App.D.C. 398, 428 F.2d 1100 (1970), we observed that such a stipulation is tantamount to a plea of guilty on all issues except insanity. By analogy to Fed.R.Crim.P. 11, governing guilty pleas, we held that the trial judge must address the defendant personally before accepting such a stipulation, to ensure that the defendant is waiving his right to trial on the merits voluntarily and with understanding of the consequences. The trial in this case occurred before our decision in *Brown*, however, and consequently that rule is not applicable here. *Id.* at 400, 428 F.2d at 1102.

2. We cannot commend this procedure too highly. When a case is tried without a jury, the record of course contains no jury instructions reflecting the principles of law to be applied to the evidence by the factfinder. Thus in the absence of a memorandum opinion, it is extremely difficult for the reviewing court to evaluate a claim that the trial court applied an incorrect principle of law.

3. He was committed on his own motion, for an examination relating both to his competency to stand trial, and to his responsibility for the act charged. *See* D.C. Code § 24–301(a); United States v. Ashe, 138 U.S.App.D.C. 356, 359, 427 F. 2d 626, 629n.3 (1970); Winn v. United States, 106 U.S.App.D.C. 133, 270 F.2d 326 (1959), cert. denied, 365 U.S. 848, 81 S.Ct. 810, 5 L.Ed.2d 812 (1961).

4. Dr. Blum gave several examples of noteworthy test responses. On the Rorschach Inkblot Test, the patient is asked to interpret a standard set of abstract inkblots. Mr. Schappel repeatedly saw blood in the test cards, and in one card he saw a "little bloodied baby." Dr. Blum stated that this was part of a pattern of responses that indicated a basic pathological condition.

As another example, the psychologist cited Mr. Schappel's response to the Bender-Gestalt Test, in which the patient is asked to copy certain geometric designs. Mr. Schappel chose to put several designs on a single piece of paper, in such a way that the designs were overlapping. Dr. Blum stated that this type of response has been correlated by past research with the personality traits of impulsiveness, and lack of emotional control.

In addition to giving sample test questions and answers, it would have been helpful if the psychologist had elaborated on his statement that particular responses have been correlated by past research with particular personality traits. It appears that for at least some psychological tests, the argument for reliability rests not on any intuitively obvious significance in particular questions and answers, but rather on a statistical correlation between particular patterns of response and particular personality traits. If that is so, then it should be made very clear to the factfinder who must evaluate expert testimony based on such tests. For in that case the factfinder should be less interested in sample questions than in overall test scores and patterns of response, and in the extent to which they match or deviate from the standard diagnostic patterns.

sis of the patient's statements concerning hallucinations and fears of persecution. Subsequently, however, he and Dr. Platkin concluded that Mr. Schappel's fear of persecution was not a sign of illness, but simply a realistic fear of the police on the part of a man who had committed many crimes.[5] Moreover, the psychiatrists concluded that Mr. Schappel's reported hallucinations were not genuine, but fabricated in a conscious effort to persuade the doctors that he was mentally ill. Accordingly, he was reported competent for trial and responsible for his acts, and released to the jail to await his trial.

Five days later, Mr. Schappel slashed his arms severely with a razor blade, and the court returned him to the Hospital for further examination.[6] He continued cutting himself and opening his wounds in the Hospital, and he was given some tranquilizing medication to control that behavior. At a second staff conference, the doctors again concluded that he was feigning the symptoms of mental illness rather than suffering from any genuine illness.

■ Mr. Schappel then filed a motion for the appointment of an independent psychiatrist to assist him in the preparation of an insanity defense.[7] The motion was granted, and he was examined by a Dr. Myers who interviewed him at the jail, and also reviewed the records of St. Elizabeths Hospital and of other institutions in which Mr. Schappel had previously been confined.[8] Dr. Myers was Mr. Schappel's principal witness at trial.[9]

■ The expert witnesses all seemed to agree that Mr. Schappel's symptoms, if genuine, indicated the presence of serious mental illness.[10] His hallucina-

5. The psychiatrists were particularly impressed by Mr. Schappel's realistic and matter-of-fact explanation for his crimes. He told the doctors at the staff conference that he liked very expensive shoes and suits, and that in order to maintain his standard of dress it was necessary for him to steal and rob. There was also some indication of involvement with narcotics. Dr. Kunev concluded that for Mr. Schappel, stealing was simply a source of income, a "way of making a living", and not an impulsive or uncontrollable act.

6. Once again the commitment was ordered on the motion of the defendant. *Cf.* note 3, *supra.*

7. Under the Criminal Justice Act of 1964, an indigent defendant in the federal courts has the right to obtain, at government expense, any expert services "necessary to an adequate defense in his case." 18 U. S.C. § 3006A(e) (1964). It is clear that psychiatric assistance in preparing an insanity defense comes within the statute. *See, e.g.,* United States v. Taylor, 437 F. 2d 371 (4th Cir. 1971) ; United States v. Tate, 419 F.2d 131 (6th Cir. 1969).

8. Mr. Schappel was given a psychiatric examination at the age of 12 or 13 in connection with charges in the District of Columbia Juvenile Court. Defense counsel obtained the records of that examination from the Juvenile Court by order of the trial court. The remaining records reviewed by Dr. Myers relate to criminal charges in Maryland. Mr. Schappel was given a pretrial mental examination in 1965 in Maryland's Perkins State Hospital; during his subsequent confinement at the Maryland House of Correction he was seen and treated by a psychiatrist; and at his parole hearing additional psychiatric information was adduced.

9. Dr. Myers submitted a lengthy written report to the court, in addition to his testimony. The report concluded with the following summary statement, which was substantially repeated in his testimony:
 In my opinion, Mr. Schoppel [*sic*] can be diagnosed as a Sociopathic Personality with marked emotional instability, impulsivity, lack of control and judgment, and paranoid trends. Under the influence of drugs and long periods of confinement he has developed a psychotic reaction of a paranoid schizophrenic nature.

10. In addition to the four expert witnesses, two lay witnesses testified, recounting episodes of bizarre behavior on the part of Mr. Schappel. These witnesses were his sister, who had been his employer for a brief period of time, and his landlady. The witnesses were permitted to testify as to their observations of Mr. Schappel, but the trial court sustained an objection to a question calling for an opinion of his mental condition based on those observations. Appellant assigns that ruling as error, *see* Naples v. United States, 120

tions, his fears, and his self-destructive conduct, together with the psychological test results, were not challenged as standard manifestations of mental illness. The conflict among the experts arose in connection with the question of the genuiness of those symptoms.

The Hospital psychiatrists, Dr. Kunev and Dr. Platkin, were convinced that Mr. Schappel was fabricating symptoms for the purpose of deception, i. e., that he was malingering. In support of that conclusion, Dr. Kunev stated that Mr. Schappel had on several occasions asked Hospital attendants to help him be declared mentally ill; according to Dr. Kunev, the patient finally told a nurse that he was giving up, that he was tired of trying to prove he was sick, and that he understood he could not fool the doctors. [Tr. 69, 75–76.] Dr. Kunev also emphasized that Mr. Schappel had a particularly compelling reason to seek to establish that he was suffering from mental illness. According to the doctor, Mr. Schappel's brother had killed a prison guard, and he feared retaliation if he should be sent to prison; consequently he strongly preferred hospitalization to imprisonment.

Dr. Platkin gave additional reasons for the conclusion that Mr. Schappel was malingering. He noted that Mr. Schappel had repeatedly slashed his arms without seriously endangering his life. Since it would not have been difficult for the patient to succeed in a suicide attempt, Dr. Platkin concluded that he was not attempting suicide, but simply seeking to arouse sympathy or to persuade the doctors that he was mentally ill. Finally, Dr. Platkin relied on the

fact that the patient spoke about having hallucinations, and he was aware they were not real. In Dr. Platkin's view, "when an individual is aware of what he calls hallucinations, which are not real, he is not having hallucinations."

Dr. Myers, on the other hand, asserted that it is "not unusual for a patient to have hallucinations which he knows are not completely real but which nevertheless are very disturbing." Both Dr. Myers, the independent psychiatrist, and Dr. Blum, the Hospital psychologist, were confident that they could distinguish Mr. Schappel's flimsy attempts to exaggerate his symptoms from his genuine symptoms of mental illness.

■■ Confronted with this range of expert opinion, the trial judge as finder of fact was obliged to resolve the apparent conflicts in the testimony. He concluded that the testimony of Dr. Blum was not necessarily in conflict with that of the Hospital psychiatrists. That conclusion was supported by the testimony of Dr. Kunev, who stated that he had no quarrel with the findings of the psychologist, so long as they were properly confined; the psychologist, he said, tests only the emotional state of the patient, and not the effect of his emotional state on behavior. Since Dr. Kunev's statement concerning the role of the psychologist was not challenged, there is no reason to question the trial judge's reliance on it in analyzing the possible conflict between the testimony of Dr. Blum and that of the Hospital psychiatrists.[11]

The testimony of Dr. Myers, however, confronted the trial judge with an unavoidable conflict in expert opinion. He resolved the conflict by accepting the

U.S.App.D.C. 123, 130, 344 F.2d 508, 515 (1964), but in our view any error in this regard was harmless. The substance of the witnesses' opinions was clearly conveyed to the factfinder; the only testimony excluded was conclusory in nature, and cumulative of the testimony of the experts.

11. We see no merit in appellant's contention that it was irrational for the court to accept Dr. Kunev's limited view of the

role of the psychologist, and that to do so was to ignore the holding of this court in Jenkins v. United States, 113 U.S.App.D. C. 300, 307 F.2d 637 (1962) (en banc). In Jenkins we held that a psychologist may be a competent witness on the issue of criminal responsibility, within the limits of his expertise. We did not, however, define the scope of that expertise, which remains a matter subject to proof in individual cases.

testimony of Dr. Kunev and Dr. Platkin "for the reason that they had a much more extensive opportunity of observing, interviewing, and studying the pertinent records in defendant's case than did the private psychiatrist on whose testimony defendant relied."

Appellant contends that it was error for the trial judge to resolve the conflict among the experts on that ground. He argues that (1) Dr. Myers's opportunity to observe was in fact not less extensive than that of the Hospital psychiatrists in any significant respect, and (2) alternatively, if it was, then appellant was deprived of his right to the assistance of a psychiatrist in preparing and presenting his insanity defense.

 We find this argument troublesome. It is standard practice in this jurisdiction for the court to commit criminal defendants to St. Elizabeths Hospital for 60 days or more, for the purpose of a pretrial mental examination.[12] In every case involving such a commitment, it could be argued that the Hospital psychiatrists have greater access to the patient than does

an independent psychiatrist, and therefore that every conflict should be resolved in favor of the government doctors. Such a rule, establishing an automatic preference for the testimony of the government doctors, would be intolerable, for it would make a nullity of the defendant's statutory right to the assistance of an independent psychiatrist.[13]

 Moreover, the factual basis for such a rule would be subject to serious question. For it is not at all clear that in a busy public hospital, staff psychiatrists have the opportunity to devote significantly more time and attention to each patient than does an independent psychiatrist. It appears that only the ward attendants ordinarily maintain constant close supervision of the patients, and their daily observations are recorded in the Hospital records, which are available not only to the Hospital psychiatrists but also to any independent expert.[14]

We do not believe, however, that the trial judge in this case was relying on a flat rule, giving an automatic preference to the government doctors. Here there

---

12. The defendants committed for examination are largely, though not exclusively, indigent. *See* Judicial Conference of the District of Columbia, Report of the Committee on Problems Connected with Mental Examination of the Accused in Criminal Cases, Before Trial 17–27 (1966).

13. *See* note 7 *supra.* It might be argued that an additional psychiatric examination is not "necessary" within the meaning of the Criminal Justice Act if the defendant has already been examined at government expense, as he has in this case under D.C. Code § 24–301(a). *See* Judicial Conference Report, *supra* note 12, at 78. Of course the statute does not give the defendant an unlimited right to repeated examinations. Nevertheless, the Criminal Justice Act was intended to put indigent defendants as nearly as possible on a par with nonindigents. In light of that purpose, the courts should apply a lenient standard in determining the need for expert services in preparation for trial. *See* United States v. Schultz, 431 F.2d 907 (8th Cir. 1970). Even under the less generous standard that prevailed before the enactment of the Criminal Justice Act, it was recognized that an indigent defend-

ant might need psychiatric assistance in addition to the court-ordered examination at St. Elizabeths Hospital. *See* Cooper v. United States, 119 U.S.App.D.C. 142, 143, 337 F.2d 538, 539 (1964) (Wright, J., concurring).

14. In this case it appears that Dr. Myers obtained the full Hospital record, with a single inexplicable exception. He testified that he was unable to get the "history work-up with the initial examining doctor," and he ultimately gave up the attempt, being satisfied with what he had. On occasion, independent experts have been less successful in their efforts to examine the Hospital records. *See, e.g.,* Washington v. United States, 129 U.S. App.D.C. 29, 32, 390 F.2d 444, 447 (1967). When a patient is committed to a public mental hospital for treatment, the hospital has a statutory obligation to make its records available to his counsel and to his personal physician. D.C. Code § 21–562. Surely justice demands no less for a patient who is committed to the hospital for observation in preparation for a criminal trial. *See* Thornton v. Corcoran, 132 U.S.App.D.C. 232, 407 F.2d 695 (1969).

is testimony that Dr. Kunev was more attentive to Mr. Schappel than to the ordinary patient. Because of Mr. Schappel's repeated efforts to injure himself, Dr. Kunev testified that he was constantly in contact with the patient, to suture and treat his wounds, and to try to prevent further self-destructive acts. Thus it appears that Dr. Kunev spent more time with Mr. Schappel than was necessary in order to make an adequate diagnosis.[15] That additional exposure to the patient undoubtedly provided Dr. Kunev with additional information about his behavior, information which may well have been helpful to the doctor in deciding whether Mr. Schappel's symptoms were genuine.

When the court must resolve a conflict in expert testimony, a number of factors may be relevant to the decision.[16] If the experts disagree about a point of psychiatric theory, the court may find it most helpful to consider such factors as the education and experience of the experts, and the internal consistency of their testimony. If, on the other hand, they disagree primarily about the character of the patient's observable symptoms, then the court may find it especially helpful to consider the experts' opportunity to observe the patient.

In this case the conflict was primarily of the latter type.[17] On the basis of the record before him, the fact-finder could reasonably conclude that while the independent psychiatrist had an adequate opportunity to observe the patient, the Hospital psychiatrists observed him especially closely, and were consequently especially well-equipped to determine whether his symptoms were genuine. Accordingly, we find no error in the fact that the court resolved the conflict between the experts by relying on the greater opportunity of the Hospital psychiatrists to observe the patient, and we affirm the judgment below.

So ordered.

WILBUR K. MILLER, Senior Circuit Judge, concurs in the result only.

---

15. There is no suggestion that Dr. Myers failed to spend enough time with Mr. Schappel to permit him to make a reliable diagnosis. Dr. Myers stated that he interviewed the patient for about an hour and a half at the D.C. Jail, spent about 6 hours reviewing Mr. Schappel's medical records before the interview, and spent an unspecified amount of time on the case afterward. It has been observed that a defendant committed to St. Elizabeths Hospital for 60 days or more ordinarily spends no more time being examined by psychiatrists than a defendant who is simply interviewed at the cell block. Judicial Conference Report, *supra* note 12, at 33–34.

16. *See* United States v. McNeil, 140 U.S. App.D.C. 228, 240, 434 F.2d 502, 514 (1970).

17. The conflict between Dr. Platkin and Dr. Myers was at least in part theoretical; they disagreed on the abstract question whether it is possible for a patient with genuine hallucinations to recognize that he is hallucinating. *See* p. 720 *supra.* But Dr. Platkin's conclusions concerning Mr. Schappel did not turn exclusively on the answer to that question, and Dr. Kunev did not deal with it at all. The basic question was whether Mr. Schappel's array of symptoms should be regarded as the genuine manifestations of illness, or as the conscious fabrications of a malingerer.