**UNITED STATES of America**

v.

**Andrew P. LEAZER, Appellant.**

**No. 24799.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 1, 1971.

Decided Jan. 19, 1972.

---

Mr. Charles C. Abeles, Washington, D. C. (appointed by this court), with whom Mr. Thomas R. Asher, Washington, D. C., was on the brief, for appellant.

Mr. Stephen W. Grafman, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, John A. Terry and James E. Sharp, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and McGOWAN and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

Appellant was arrested and charged with a violation of the federal narcotics laws, after a police officer on foot patrol had observed him in an ice cream store counting out capsules into the hand of a fifteen-year-old. A search of the appellant revealed that he was carrying additional capsules and a white powder in a package; ten capsules were recovered from the juvenile, who was also arrested. The capsules and the package contained heroin.

At his trial before a jury appellant presented uncontradicted evidence which tended to show that the capsules were to be delivered by the juvenile to his father. The defense case was grounded on an insanity defense, which appellant attempted to establish by presenting three expert witnesses. On several occasions while these three witnesses were on the stand, the trial court took over questioning from defense counsel. Upon completion of the defense case, appellant's counsel moved for a mistrial on the basis of the court's alleged excessive participation in the examination of these witnesses. The motion was denied.

The jury found appellant guilty on all four counts of an indictment charging

him with (1) sale of narcotic drugs to a juvenile,[1] (2) sale of narcotic drugs,[2] (3) possession of narcotic drugs not in the original stamped package,[3] and (4) receipt and concealment of narcotic drugs.[4] He was sentenced under Title II of the Narcotic Addict Rehabilitation Act of 1966,[5] was subsequently found to be an eligible offender, and the record indicates that he is presently undergoing treatment in the Federal Correctional Institution in Danbury, Connecticut.

On this appeal appellant raises three contentions: (1) that the court below prejudiced the appellant's right to a trial by jury by the court's substantial participation in the examination of defense witnesses; (2) that the lower court's refusal to permit appellant to be committed under Title I of the Narcotic Addict Rehabilitation Act of 1966 was a denial of equal protection of the law; and (3) that the first count of the indictment, charging sale of heroin to a minor, should have been dismissed because of evidence indicating that the minor did not receive the drug for himself. We find the appellant's contentions to be without merit, and we affirm the judgment and sentence of the trial court.

I. *The Participation of the Trial Court in the Questioning of Defense Witnesses*

In Washington v. United States[6] we placed a burden on trial courts where the insanity defense is raised to ensure that the jury bases its determination of blameworthiness on relevant behavioral data:

> [T]estimony in terms of "mental disease or defect" seems to leave the psychiatrist too free to testify according to his judgment about the defendant's criminal responsibility. . . . This kind of testimony does not give the jury a satisfactory basis for determining criminal responsibility. A proper adjudication requires that the jury be fully informed about the defendant's mental and emotional processes and, insofar as it affects these processes, his social situation. . . . With the relevant information about defendant, and guided by the legal principles enunciated by the court, the jury must decide, in effect, whether or not the defendant is blameworthy. . . . The trial judge should limit the psychiatrists' use of medical labels—schizophrenia, neurosis, etc. It would be undesirable, as well as difficult, to eliminate completely all medical labels, since they sometimes provide a convenient and meaningful method of communication. But the trial judge should ensure that their meaning is explained to the jury and as much as possible, that they are explained in a way which relates their meaning to the defendant.[7]

These standards which guide the trial court can and often do require the court's active participation in the examination of witnesses, a fact which we have recognized for some time.[8]

Reviewing the record in this case, and being mindful of our recent observation that a merely quantitative approach cannot determine whether the judge's participation in questioning is improper, United States v. Wyatt,[9] we find that the defense testimony in this case was often unclear, sometimes woefully muddled, and we cannot say that the trial court in its attempts to clarify

1. 21 U.S.C. § 176b.

2. 26 U.S.C. § 4705(a).

3. 26 U.S.C. § 4704(a).

4. 21 U.S.C. § 174.

5. 18 U.S.C. §§ 4251 et seq.

6. 129 U.S.App.D.C. 29, 390 F.2d 444 (1967).

7. 129 U.S.App.D.C. at 38, 39, 390 F.2d, at 453, 454.

8. See Burgman v. United States, 88 U.S. App.D.C. 184, 188, 188 F.2d 637, 641, cert. denied, 342 U.S. 838, 72 S.Ct. 64, 96 L.Ed. 634 (1951), United States v. Barbour, 137 U.S.App.D.C. 116, 420 F.2d 1319 (1969), and cases there cited.

9. 143 U.S.App.D.C. 136, 138, 442 F.2d 858, 860 (1971).

stepped out of bounds. We find that the trial court's participation was an acceptable effort to conform with the *Washington* standards, and obviously any such affirmative action on the trial judge's part creates some problems of its own. Of these the trial judge was keenly aware and sought to overcome them by an instruction to the jury, which admonished them that they were "not to draw any inference whatsoever from any questions the Court asks, or anything the Court does or says as to how the Court feels the case should be decided." [10] We are unable to find that the trial court's participation deprived the appellant of his right to a trial by jury or prejudiced him in any manner calling for a new trial.

### II. *The Refusal to Commit the Appellant under Title I of NARA*

■ Appellant argues that by denying addicts, like himself, who sell narcotics to feed their habits, pre-conviction treatment under Title I,[11] Congress has arrived at a classification "which plainly violates the Constitution's guarantee of equal protection of the laws." [12] In view of the availability of Title II [13] post-trial commitment for addicts, however, we are inclined to accept the view of the Government that the two titles represent a "balancing" between the policies of discouraging the sale of narcotics and facilitating the treatment of addicts.[14] Congress has decided to allow the less blameworthy non-trafficking addict an additional opportunity for treatment not available to the trafficking addict; it is not for us to make the policy judgment that the legitimate goal of deterrence is not thus properly served.

Given this express deterrent policy, and the recorded need for an accommodation between the views of those in Congress who felt that *all* addicts should be treated civilly, and those who felt that *all* traffickers should be punished criminally, [15] we must recognize that "equal protection does not require that all persons be dealt with identically," and that here we have a distinction with "some relevance to the purpose for which the classification is made." Baxstrom v. Herold.[16]

### III. *The Refusal to Dismiss the Count Charging Sale of Heroin to a Minor*

■ Appellant takes the position on this appeal, as he did in the trial court, that 21 U.S.C. § 176b should not be applied to transfers of narcotics to juveniles when the narcotics are not for the juvenile's own use, and the juvenile acts as a "mere agent." [17] It would be helpful if there were some case law to guide us here, but apparently there is none. In view of this paucity, the plain words of the statute, and the possibility of juvenile use of narcotics even when they are not sold *for* him, we think appellant's contention must fail.

The penalty provisions of the statute here in question apply to "whoever, having attained the age of 18 years, knowingly sells, gives away, furnishes or dispenses . . . any heroin unlawfully imported or otherwise brought into the United States, to any person who has not attained the age of 18 years. . . . " There is no exception in the statute for those who transfer heroin to minors for the use of adults. Appellant observes, rightly we think that Congress was concerned about youths being intro-

---

10. Transcript, at 273–274.

11. 28 U.S.C. § 2901(a).

12. Brief for Appellant, at 23.

13. 18 U.S.C. § 4251(f).

14. Brief for the Government, at 17.

15. See Hearings on S. 2191 before the Subcommittee on Criminal Law and Pro-

cedures of the Senate Committee on the Judiciary, 89th Cong., 2d Sess. (1966); Hearings on H.R. 9167 before Subcommittee No. 2 of the House Committee on the Judiciary, 89th Cong., 1st and 2d Sess. (1965–1966).

16. 383 U.S. 107, 111, 86 S.Ct. 760, 763, 15 L.Ed.2d 620 (1966).

17. Brief for Appellant, at 25.

duced to the use of drugs or otherwise pulled into the stream of drug distribution. We also think it plain, however, that the drugs given to the youth do not have to be intended for him in order for him to be introduced to their use or drawn into drug-dealing. We can foresee juveniles tempted to use themselves the drug intended for another, or to transfer the drug, meant for an adult, to another juvenile. At the very least, the transaction cannot fail to excite the juvenile's curiosity about what the capsules contain and why people buy them; at the very worst, it might tempt him to try them or to realize profits from their sale, and thus plunge him into the stream of drug distribution. We agree with the District Court and the Government that the only safe rule is that a juvenile may not be made an agent to transfer heroin, whether it be intended for his own use or not, without running afoul of 21 U.S.C. § 176b.

The judgment of the District Court is Affirmed.

---

1. In response to the testimony of the defense's expert witnesses, the trial judge made comments which included the following:

I am not interested in [the defendant's] admission. I am interested in your own view of him as a patient. Not what he told you, but your view of him as a patient. (Tr. at 50).

* * * * *

Just a minute. He is going to have to give all of the facts which lead him to the opinion that everyone who uses drugs is mentally ill. He can't just state that as an opinion. He is going to have to give the facts that lead him to that conclusion. (Tr. at 85).

* * * * *

I have gotten rather lost. I thought that this psychologist had made a diagnosis based on five or six specific tests which you identified. Now if he has made his diagnosis on the basis of other information, which he now apparently has, I think all of that information should be identified, including just exactly what information he has used on the drug problem, and the extent to which he has used ward notes, and other matters that he has already referred to. (Tr. at 138–39).

---

BAZELON, Chief Judge (concurring):

I am a great deal more troubled than my colleagues by the trial court's questioning of the witnesses who testified on the insanity defense. In what may well have been a good faith effort to elicit the factual underpinning of the witnesses' conclusions, the trial court repeatedly interrupted defense counsel's questioning of the witnesses, and assumed a considerable measure of the responsibility for their examination. In the course of his questioning, the trial judge made a number of pointed comments and observations which could have been taken by the jury to reflect some skepticism of the insanity defense and the manner in which it was presented. A representative sampling of these remarks is set out in the margin.[1] Rejecting appellant's claim of error, the Court characterizes the trial judge's action as "an acceptable effort to conform with" our decision in Washington v. United States, 129 U.S. App.D.C. 29, 390 F.2d 444 (1967).[2]

* * * * *

The testimony will be stricken. He must give the grounds for his opinion. He simply cannot state his opinion. He must give his grounds. That is what I thought was very clear. * * * He has given no facts. He says he performed a certain number of tests, but the results of those tests, the aspects of the tests, the reaction of the defendant to the ink blots, and to those other matters have not been presented. Accordingly, there is no foundation for his testimony and I will strike it unless you want to pursue it, Mr. Romero. (Tr. at 140–41).

* * * * *

That is a conclusion. Don't say O.K. to the Court. Respond to the question, sir. I have said to you, give us an example of what it is you are talking about. The jury must understand this. That is my whole interest, to be sure they understand it. (Tr. at 142–43).

2. In two recent cases not involving the insanity defense, appellants have raised objection to the intervention of this trial judge in the examination of witnesses. See United States v. Jackson, No. 24,421 (D.C.Cir. Dec. 14, 1971) (mem.); United States v. Simpson, No. 24,817 (D.C.Cir. July 19, 1971).

We can assume that the trial judge's active role was consistent with the objectives of *Washington*, but it is important to keep in mind precisely what those objectives were. By urging trial judges to expose the facts and logic underlying expert opinions, *Washington* attempted to strip away the cloak of unreality which had traditionally prevented meaningful analysis of the insanity defense. Here, the trial judge apparently attempted to comply with *Washington*. Our obligation is to explore the issues which *Washington*, through his action, has brought to light. The Court does, of course, concede that the trial judge's intervention resulted in "some problems of its own." I am convinced that these "problems," which the Court does not discuss, throw a disquieting shadow over many of the assumptions which are fundamental to our view of the insanity defense and its proper administration. Ignoring these festering problems will not cause them—like old soldiers—to fade away.

### I.

In *Washington* we deplored the tendency of psychiatrists to testify in conclusory terms, and we urged them to direct their testimony away from labels and psychiatric code-words and into the facts and reasoning which support their opinions. We assumed that this shift would enhance the jury's ability to make the "intertwining moral, legal, and medical judgments"[3] on which the resolution of an insanity defense depends. I have no doubt that *Washington* pursued a worthy objective, for it was designed to facilitate and inform the resolution of what is perhaps the most difficult question ever put before a jury—the question of a defendant's responsibility for criminal behavior. That determination requires the jury, in this or any other jurisdiction, to wrestle with complex and specialized testimony and to make distinctions pursuant to a legal standard which must seem at best obtuse and which depends on "moral, legal, and medical judgments."[4] That standard can only mean that the jury must evaluate the defendant's impairment "in light of community standards of blameworthiness, to determine whether the * * * impairment makes it unjust to hold him responsible."[5]

In his effort to illuminate the factual background, the trial judge must take all possible steps to minimize the danger that he will unintentionally reveal, by implication or innuendo, his own hostility to the defendant's insanity claim. Indeed, the jury may view his examination of the witnesses as an indication of hostility even where none exists. In view of the extreme difficulty of the jury's role in resolving a responsibility defense, we can hardly be surprised if the jury abandons the inquiry and reaches out for the easy answer seemingly offered by the trial judge. While the jury may not be ideally qualified to decide whether a defendant's behavior controls were so substantially impaired that he should not be held responsible, no alternative to the jury is yet available. Until our knowledge increases to a point where sharp distinctions emerge and answers come more easily, the question will have to be entrusted to a jury for resolution with reference to community concepts of blameworthiness.

The problem can be mitigated, perhaps, by a special instruction such as the trial court's warning here that the jury should not "draw any inference whatsoever from any questions the Court asks, or anything the Court does or says as to how the Court feels the

3. King v. United States, 125 U.S.App. D.C. 318, 324, 372 F.2d 383, 389 (1967).

4. *Id.*

5. United States v. Eichberg, 142 U.S.App. D.C. 110, 115, 439 F.2d 620, 625 (1971)

(Bazelon, C. J., concurring). *See* United States v. Bennett, 148 U.S.App.D.C. ——, at —— – ——, 460 F.2d 872, at 876–878 (1972); *cf.* King v. United States, 125 U.S.App.D.C. at 323, 372 F.2d at 388; Holloway v. United States, 80 U.S.App. D.C. 3, 4, 148 F.2d 665, 666 (1945).

case should be decided." (Tr. at 273–74.) But it seems to me highly doubtful that such an instruction can always, or even often, discourage the jury from adopting the result apparently favored by the Court. If jurors were offered a meaningful instruction on their role in resolving an insanity defense, they might have less difficulty obeying an admonition to draw no inference from the trial judge's participation. But instead of explicitly and candidly instructing the jury to consider whether the defendant can *justly* be held responsible, we describe the issue as one of fact [6] and rely on the jury to recognize that the question is really much more complex.

I have pointed out before that "if our whole approach to judicial review of the jury's determination depends on the theory that the jurors are measuring mental disability in terms of community concepts of blameworthiness, then we have an obligation to tell them that is what they are expected to do." [7] But *Washington* forces us to confront an additional reason for candor. The jury's ability to look behind the instruction and discern its proper function will surely be impaired where the trial judge has signalled a favored result. An admonition to ignore the trial judge's signal cannot be effective if the jurors are not explicitly made aware of the appropriate inquiry, and thus are unable to see why the inquiry has been entrusted to them and not the trial judge.

## II.

Even if we could fully resolve that problem, we would still have to contend with a second and to my mind more troublesome problem which *Washington* brings to light. By exploring the basis of expert testimony (with questions that may be more penetrating and skillful than any government counsel could have mustered), the trial judge may expose the inadequate presentation of the insanity defense and thus virtually assure conviction. Yet it is surely not the defendant's fault that his counsel is poorly prepared or inexperienced in this difficult area. And it requires an extraordinary leap to conclude that the defendant should be prejudiced by the inadequate testimony of government experts who examined the defendant at a government hospital pursuant to a court order and who are called to testify on his behalf. That, however, is precisely the leap that we routinely make in almost every case where an indigent raises an insanity defense. It is no answer that an indigent can obtain the services of a private psychiatrist at government expense. A defendant is entitled to rely on the government to provide a legally adequate examination at the hospital to which he is committed for observation. [8] And the examination is clearly inadequate if conducted by experts who are incapable of adequately presenting their findings in a courtroom. Moreover, if the defendant does make use of a private psychiatrist who disagrees with the hospital's diagnosis, he is almost sure to find that the private psychiatrist's testimony will be disparaged by the government as grounded on an insufficient period of observation. [9]

In some cases—and this may well be one—the trial judge's silence would

---

6. Our present instruction tells the jury that a defendant is not guilty by reason of insanity if he was suffering from an abnormal condition of the mind which substantially impaired his mental or emotional processes and behavior controls. McDonald v. United States, 114 U.S.App. D.C. 120, 124, 312 F.2d 847, 851 (1962). On the inadequacy of our present instruction, *see generally* United States v. Eichberg, 142 U.S.App.D.C. 110, 115–116, 439 F.2d 620, 625–626 (1971) (Bazelon, C. J., concurring).

7. United States v. Eichberg, 142 U.S.App. D.C. at 116, 439 F.2d at 626 (Bazelon, C. J., concurring).

8. *Cf.* Henderson v. United States, 123 U.S.App.D.C. 380, 385, 360 F.2d 514, 518–519 (Bazelon, C. J., concurring).

9. *See* United States v. Bennett, 148 U.S. App.D.C. ——, 460 F.2d 872, at 874, 875 and n. 4 (1972) ; United States v. Schappel, 144 U.S.App.D.C. 240, 445 F.2d 716 (1971) ; Rollerson v. United States, 119 U.S.App.D.C. 400, 343 F.2d 269 (1964).

leave the insanity defense unimpressive but intact, while his probing questions would quickly reduce it to a shambles. In the long run we gain nothing if the trial judge chooses to remain silent in order to minimize damage to the presentation of the defense. Unless the problem is exposed, it is impossible to take corrective action that would guarantee, first, the assistance of counsel specially qualified to handle an insanity defense, and second, the testimony of psychiatric experts competent not only to examine the defendant but also to present their findings adequately at trial.

### III.

Another problem which *Washington* forces to our attention is the emptiness of our time-honored insistence that the burden of proof rests on the government.[10] As a practical matter, even if defense counsel is experienced and fully prepared and the defense witnesses are knowledgeable and lucid, the insanity defense must overcome substantial obstacles in order to prevail. A psychiatrist who testifies that a defendant suffers from no condition that could properly be considered a mental illness is likely to have little difficulty complying with *Washington* and making an impact on the jury. He need only assert the absence of any recognized symptoms of mental illness. To break down that testimony, defense counsel must have enough expertise in psychiatry to pick out the weak points and oversights in the analysis. Unfortunately, very few attorneys, if any, possess the requisite expertise, and we have no automatic procedure for enabling them to consult with psychiatric experts in the preparation and conduct of the defense.

By contrast, it often requires little or no expertise to ridicule the testimony of a psychiatrist or psychologist who asserts that the defendant is in fact mentally ill. For example, by requiring the witness to describe in isolation the most minute "symptoms" on which the diagnosis rests—the defendant's answer to a particular question or his reaction to a particular ink-blot—the prosecution may succeed in making these symptoms seem trivial or commonplace. This process of fractionating a complex diagnosis and deflating it piece by piece was apparent in the case before use. The government psychologist who testified in support of the defense offered testimony such as the following in explanation of his diagnosis:

THE WITNESS: * * * This [referring to Defendant's Exhibit No. 3] is a popular kind of card on the Rorschach, where people see human figures, commonly. Not all the time, but commonly. If they see it anywhere, they generally would see them here. Mr. Leazer does not see them here. He sees animals there. Just an example.

* * * * * *

THE COURT: Well now, let's take this one [referring to Exhibit No. 3], Doctor. You say that most people see human figures, by which I take it some people see animals?

THE WITNESS: That is correct.

THE COURT: This defendant is a man who saw animals. What kind of animals did he see?

THE WITNESS: Animals—he said dogs eventually. He said, animals, and he said dogs when we asked him what kind of animals.

THE COURT: Very well. What did you conclude from that?

THE WITNESS: Nothing in isolation * * *

(Tr. at 146–47.)

The problem is by no means limited to the cross-examination of psychologists. Defending his conclusion that appellant was suffering from a passive-aggressive personality, one of the defense psychiatrists testified as follows:

* * * I think you can see on the interview, for example, a kind of composure, a sparsity of feeling tone.

---

10. *Cf.* United States v. Eichberg, 142 U.S. App.D.C. 110, 113–114, 439 F.2d 620, 623–624 (1971) (Bazelon, C. J., concurring).

When people talk, they usually communicate a certain amount of feeling or by bodily movement, gesturing and so forth. There is also a kind of presenting himself in kind of a compliant, docile manner. In my interview, there seemed a lack of spontaneity of people when they talk. * * * It seems—Mr. Leazer gave me the impression in his early life a lot of the stress was on control rather than—on control and limitation and structure rather than on spontaneity, feeling, being able to just be with people.

That testimony was followed by a colloquy between the witness and the Court:

THE COURT: You are saying, Doctor, he had trouble making friends. Is that what you are saying?

THE WITNESS: I am saying not trouble making friends, having trouble sustaining any friendship.

THE COURT: Having trouble sustaining friends, and he has a feeling of a need for attention is that right?

THE WITNESS: Attention, interest from someone.

THE COURT: Now, what were the facts that led you to that conclusion?

THE WITNESS: As I said, a certain history of needing to get involved constantly in protective types of situations.

THE COURT: That is a conclusion. Give us some facts.

(Tr. at 75–76.)

Perhaps another psychiatrist could have provided a more effective presentation of the defendant's condition. But it seems to me more plausible to conclude that any psychiatrist subjected to persistent examination would be hard pressed to persuade a jury that a defendant's behavior controls were substantially impaired by a mental condition like appellant's. The practical result may be that a defendant suffering from what psychiatrists call a passive-aggressive personality can never prevail on an insanity defense—not because his behavior controls are unimpaired, but because the psychiatric testimony on his behalf is invariably demolished. The ramifications of that result are more properly discussed in the context of our en banc reconsideration of the responsibility test.[11]

IV.

*Washington* did not create the difficulties which I have described—it only uncovered them. By refusing to see that the emperor has no clothes we guarantee that nothing will be accomplished. Our difficulties can no longer be swept "under the rug of a doctrine that saves our face by hiding our troubles." [12]

11. United States v. Brawner, No. 22,714.

12. United States v. Trantham, 145 U.S. App.D.C. 113, 122, 448 F.2d 1036, 1045 (1971) (statement of Chief Judge Bazelon as to why he would grant rehearing en banc); United States v. Carter, 141 U.S.App.D.C. 46, 57, 436 F.2d 200, 211 (1970) (Bazelon, C. J., concurring).