187 N.J. Super. 113 (1982)
453 A.2d 913
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
DONATO CANTALUPO AND PATRICK LEONARD CANTALUPO, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Submitted August 16, 1982.
Decided November 29, 1982.
*116 Before Judges FURMAN, TRAUTWEIN and GAULKIN.
Joseph H. Rodriguez, Public Defender, for appellant Donato Cantalupo (Arnold C. Lakind, designated counsel, of counsel and on the letter brief).
Joseph H. Rodriguez, Public Defender, for appellant Patrick Leonard Cantalupo (Murray Gendzel, Pool Attorney, of counsel and on the brief).
Irwin I. Kimmelman, Attorney General of New Jersey, for respondent (Harold J. Bush, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by TRAUTWEIN, J.A.D.
This joint appeal raises questions, as to defendant Donato Cantalupo, concerning the propriety of the trial judge's refusal *117 to order the Public Defender to provide transportation for alleged alibi witnesses from Florida to New Jersey and whether the destruction of a codefendant's taped statement deprived defendant of a fair trial. Issues raised as to codefendant Patrick Leonard Cantalupo concern contentions that the jury verdict was against the weight of the evidence, error in the trial judge's charge relating to defendant's flight, and excessiveness of sentence.
Defendants Donato and Patrick Leonard Cantalupo were indicted for breaking and entering with intent to steal, contrary to N.J.S.A. 2A:94-1 (count I); stealing goods in excess of $200, contrary to N.J.S.A. 2A:119-2 (count II); theft of credit cards, contrary to N.J.S.A. 2A:111-42 (count III) and unlawful possession of credit cards, contrary to N.J.S.A. 2A:111-42 (count IV).
At the end of the State's case counts III and IV charging theft of credit cards and possession of credit cards were dismissed. Count II was amended to charge larceny of goods valued at less than $200. The jury then found defendants guilty of counts I and II.
After defendants' motions for new trials were denied, each was sentenced to a prison term of five to seven years for breaking and entering with intent to steal and a concurrent six months jail term for stealing.
Both defendants declined to take the stand. The State's evidence showed that on March 23, 1979, after a dinner in New York with his date, Maryann Ryan Pierce (Pierce)[1], Joseph Furst (Furst) and Pierce met defendants Patrick Leonard Cantalupo (Pat), Pat's wife Victoria (Vicki) and Donato Cantalupo (Donato). Eventually the five individuals drove to New Jersey and spent the night at Pat's house. The following afternoon the five were driving through a residential area in Watchung, New Jersey, in Vicki's maroon BMW automobile when Furst suggested "doing a burglary." After Vicki checked to see that no one *118 was home at the house selected for the burglary, Furst and Pat got out of the car and went to the back of the house located on Anderson Road in Watchung. Furst and Pat entered the home after breaking a back window, but upon hearing the sound of a television the two made a hasty retreat but not without first taking a briefcase, a purse and some $40 in cash. While Furst and Pat were in the house, Donato drove around the neighborhood with Vicki and Pierce. Following their retreat Furst and Pat broke open the briefcase. Inside was a cassette recorder. Thereafter they entered the waiting BMW automobile and departed. While the burglary was being committed, Watchung Police Detective Michael Scott noticed an unfamiliar car proceeding from the cul-de-sac on Anderson Road. He noted that it was a maroon two-door BMW containing three occupants. Shortly after this observation Detective Scott saw the BMW again but this time it was carrying five occupants. His suspicions aroused, Scott began to follow the car. He activated his headlights and red flashing light, signalling the BMW to pull over. The driver of the BMW did not heed the signals but instead sped away on Route 22, traveling at 72 m.p.h. The BMW went through a number of intersections before being diverted into a parking lot by a police roadblock. A patrol car summoned by Scott joined the chase. This car and Scott's then cut off the BMW as it attempted to exit the parking lot. Three males then jumped from the BMW and ran in different directions. Scott saw the BMW begin to move toward an exit and ordered it to stop. The car continued to move until Scott drew his gun and arrested its occupants, Pierce and Vicki. Patrolman Robert Reilly left his car and pursued the fleeing men. He caught Furst at gunpoint. Pat and Donato escaped. During the chase Detective Scott had seen two objects thrown from the BMW. He radioed to have them picked up and they were subsequently identified as a purse and a tape cassette. Furst, Pierce and Vicki were then taken to the Watchung Police Station. On March 26, 1979 Detective Scott interviewed Pierce after reading her the Miranda warnings, and taped her account of the events described above. Upon concluding her story *119 Pierce complained, on tape, that she had received poor treatment from the Watchung Police. Scott then took another statement from Pierce which, according to the proofs, was identical to the first, but included a concession that she had been fairly treated by the police. The first taped conversation was either lost, destroyed or wiped out due to inadvertence. On March 27, 1979 Pat was arrested at the Watchung Police Station while inquiring into the release of the BMW. Donato was subsequently arrested as well.
On November 10, 1980 a bench warrant was issued for the arrest of Pat inasmuch as he had failed to appear for trial of the pending indictment. At that time another warrant had been issued for Pat's arrest stemming from an unrelated parole violation. As a result of these warrants, the police in Largo, Florida, were contacted. Pat's brother Lenny owned a pawn shop in Largo and on January 6, 1981 a police officer saw Pat in his brother's shop. The officer chased Pat and with the aid of another officer finally apprehended him in a hallway of the pawn shop. Pat waived extradition to New Jersey and was jointly tried with his brother Donato. This appeal followed.

I
Donato first contends that he was denied his right to effective assistance of counsel when the Public Defender refused to transport his alibi witnesses to New Jersey from Florida and that, in this connection, the trial judge erred in refusing to order the Public Defender to provide such transportation.
These issues arose when, on the second day of trial, Donato's counsel informed the trial judge that he was unable to bring alibi witnesses to New Jersey from Florida. He explained that "we have no funds and the public defender refuses to allow funds to get these people here. They are key witnesses for the defendant. Without them the defense of alibi is precluded." The judge denied counsel's request to order the Public Defender's office to provide transportation. Significantly, at no time did the Public Defender attempt to make a showing of necessity *120 in connection with these witnesses. He did not provide the court with the names of the alibi witnesses nor make a proffer as to their anticipated testimony in order to show its essential value. Certainly, defendant had more to do than merely state there were no funds available, either through the Public Defender or otherwise, for transporting these alibi witnesses. In an application of this nature the trial judge is called upon to balance competing interests  the expense the public would bear compared to the value of the testimony of the witnesses. See, generally, United States v. Bass, 477 F.2d 723 (9 Cir.1973); United States v. Sanders, 459 F.2d 1001 (9 Cir.1972); United States v. Shappel, 144 U.S.App.D.C. 240, 445 F.2d 716 (1971); United States v. Theriault, 440 F.2d 713, 717 (5 Cir.1971); State v. Green, 55 N.J. 13 (1969), and State v. Ryan, 133 N.J. Super. 1 (Cty.Ct. 1975) (dealing with expert witnesses). Absent this factual supportive framework, we perceive no error in the trial judge's refusal to order the office of the Public Defender to produce the witnesses at its own cost and expense. In view of this conclusion we find it unnecessary to address the argument of defendant that a trial judge has the basic authority to order the Public Defender to advance the travel expenses of alibi witnesses.
Still in the same context, defendant argues that the refusal of the Public Defender's office to finance the transportation of alibi witnesses and the failure of the trial judge to so order deprived him of effective assistance of counsel, contrary to the Sixth Amendment to the Constitution of the United States and N.J.S.A. 2A:158A-5, which provides, in pertinent part, that the office of the Public Defender is to provide "All necessary services and facilities of representation (including investigation and other preparation) ..." Defendant adds that this denial of assistance on the grounds of financial inability also violates the spirit of N.J.S.A. 2A:158A-11, which provides, in part, that "The primary duty of all members of staff and of others engaged on a case basis shall be to the individual defendant, with like effect and to the same purpose as though privately engaged by him *121 and without regard to the use of public funds to provide this service." Defendant does not fault his counsel for not adequately supporting his request for financing transportation but simply argues that the Public Defender's assertion of lack of adequate funds is patently irrelevant and invalid as a reason for such refusal. We disagree. The Public Defender is vested with wide discretion in committing and allocating his financial resources to the multitude of indigents seeking his services in the first instance where an applicant's eligibility, on the basis of indigency, must be determined. N.J.S.A. 2A:158A-14. This discretion is necessary, for in the real world of public funding of state agencies, of which the office of the Public Defender is one, resources are not unlimited but, rather, burdened with budgetary limitations. We perceive no compelling reason to limit the Public Defender's discretion solely to a determination of initial eligibility on the basis of indigency. We conclude that this discretionary authority extends to what services and facilities shall be provided the Public Defender's indigent clients, including interstate transportation for alibi witnesses, wherein the factors of need and real value to such client's defenses shall be weighed against the financial constraints inherent in the Public Defender's budget. This conclusion comports realistically with that which exists between a defendant and privately retained counsel where the financial resources of the client must, perforce, result in the same type of value judgments based on a similar type of balancing. We cannot conceive that the Legislature, in creating the office of Public Defender, intended that an indigent defendant would be entitled to emoluments more favorable than that which a nonindigent defendant could afford himself, N.J.S.A. 2A:158A-11, in a literal sense, to the contrary notwithstanding. United States v. Shappel, supra.
Finally, pressing the issue of alibi witness transportation, defendant argues that the failure of the Public Defender "to take steps to secure the presence of his alibi witnesses constitutes incompetence of counsel" to such a degree as to warrant reversal and a new trial. In his argument on this score he seems *122 to impute "fault" in the alleged failure to secure these witnesses to the individual public defender who represented him at the trial  a "fault" which defendant transfers from the office of the Public Defender and the trial judge to his trial counsel. Trial counsel attempted to produce these witnesses but to no avail. Significantly, defendant does not bottom his claim of incompetence on the failure of his counsel to lay that essential framework regarding the need and value of the projected alibi witnesses' testimony. We determine this contention to be without merit. R. 2:11-3(e)(2). In any event, we conclude that the conduct of defense counsel did not rise to such a level as to make the trial a farce or a mockery of justice. State v. Edge, 57 N.J. 580, 593 (1971).
Donato next contends that the destruction of a taped statement of codefendant Pierce given to the State mandates reversal. Defendant claims for the first time, as plain error, that he was denied a fair trial by virtue of the fact that the police did not preserve the first of two taped statements given to them by Pierce. From the record, it is clear that the first statement was either wiped out, lost or destroyed inadvertently. Moreover, we are satisfied from the proofs adduced at the trial that the two tapes did not differ significantly. From our careful review of the record in this connection, we conclude that this issue is clearly without merit. R. 2:11-3(e)(2).

II
Pat Cantalupo argues that the jury verdict was against the weight of the evidence. He bottoms this argument on two contentions  lack of evidence identifying him as one of the persons who entered the victim's home and stole certain properties therein and the lack of evidence of a larcenous intent to steal items in excess of $200 in value, or, for that matter, less than $200 in value, contrary to N.J.S.A. 2A:94-1.
With regard to the identity question we conclude, after a careful study of the record, that this issue is clearly without merit. R. 2:11-3(e)(2). Codefendant Furst explicitly identified Pat as the person with whom he had committed the burglary.
*123 With regard to the issue of intent to steal in connection with the first count of the indictment, Pat contends that without evidence of the value of the stolen items, his requisite intent to steal was unproven. A factfinder, here the jury, has a right to infer from all the surrounding circumstances of defendant's actions in breaking and entering a dwelling that it was his purpose to steal whatever was available, irrespective of its value. State v. Warren, 173 N.J. Super. 528 (Resentencing Panel 1980). Here, the evidence was overwhelming that defendants broke into a dwelling with the intent to steal items of value. Indeed, the proofs showed that some items taken had intrinsic value albeit there was no express proof on this score. As was noted hereinbefore the taking of some $40 in cash was admitted. Thus, we conclude that N.J.S.A. 2A:94-1 does not require the State to prove the value of the items stolen from a structure or that defendant specifically indicated his intent to steal property with a value of at least $200 or for that matter less than $200. Rather, we determine that the jury may legitimately infer such purpose from the surrounding circumstances of the offense. State v. Warren, supra; State v. Martinez, 112 N.J. Super. 552, 556 (App.Div. 1970).
With respect to Pat's next argument, we conclude that the trial judge properly allowed proof of defendant's flight from custody as evidence, if the jury so chose to find, of his consciousness of guilt. It has been established that evidence of a defendant's unexplained flight is generally admissible as tending to prove his consciousness of guilt. State v. Wilson, 57 N.J. 39, 49 (1970); State v. Sullivan, 43 N.J. 209, 238-239 (1964), cert. den. 382 U.S. 990, 86 S.Ct. 564, 15 L.Ed.2d 477 (1964); State v. Apostolis, 133 N.J. Super. 175 (App.Div. 1975).
Lastly, Pat contends that his sentence was excessive. We have carefully reviewed the record and do not perceive a showing of such clear and compelling circumstances as to persuade us to disturb the sentence on the grounds of a miscarriage of justice. State v. Whitaker, 79 N.J. 503, 512 (1977).
*124 For the reasons hereinbefore stated, we affirm the convictions and sentences of both defendants.
NOTES
[1] The indictment names "Maryann Ryan." After indictment, but prior to trial, she wed a person named "Pierce."