Lena **ROBINSON**, Appellant

v.

**DIAMOND HOUSING CORPORATION,**
Appellee.

No. 24508.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 20, 1971.

Decided April 3, 1972.

Mr. Richard B. Wolf, Washington, D. C., with whom Mr. C. Christopher Brown, Baltimore, Md., and Miss Marilyn Cohen, Washington, D. C., were on the brief, for appellant.

Mr. Herman Miller, Washington, D. C., for appellee.

Before WRIGHT, McGOWAN and ROBB, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

In Edwards v. Habib, 130 U.S.App.D. C. 126, 397 F.2d 687 (1968), cert. denied, 393 U.S. 1016, 89 S.Ct. 618, 21 L. Ed.2d 560 (1969), this court held that a tenant may assert the retaliatory motivation of his landlord as a defense to an otherwise proper eviction. In Brown v. Southall Realty Co., D.C.App., 237 A.2d 834 (1968), the District of Columbia Court of Appeals held that a lease purporting to convey property burdened with substantial housing code violations was illegal and void and that hence the landlord was not entitled to gain possession for rent due under the invalid lease. *Cf.* Javins v. First National Realty Corp., 138 U.S.App.D.C. 369, 428 F.2d

1071, cert. denied, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970). The case before us involves the intersection of these two principles. Specifically, it raises the question whether a landlord who has been frustrated in his effort to evict a tenant for nonpayment of rent by successful assertion of a *Southall Realty* defense may automatically accomplish the same goal by serving a 30-day notice to quit.

Appellant argues that she should be permitted to show that her landlord, Diamond Housing, was motivated by a retaliatory intent when it served the notice to quit. Diamond Housing contends that a retaliatory eviction defense has no place in a situation where, as here, the landlord is unable or unwilling to make the repairs on the premises that would entitle it to rent under *Southall Realty* and alleges an intent to take the property off the housing market. When the District of Columbia Court of General Sessions granted summary judgment to appellee, appellant renewed her arguments in the District of Columbia Court of Appeals. That court affirmed, holding:

> " * * * [T]he retaliatory defense of Edwards v. Habib * * * is not available to a tenant in a case such as this where she was successful in a prior Landlord and Tenant action and is being evicted after the expiration of a thirty-day notice because the landlord wishes to withdraw the property from the rental market. The *Ed-*

*wards* case involved a situation where the landlord attempted to evict the tenant because of her complaints to the housing authorities and it should be, we think, limited to its facts."

Robinson v. Diamond Housing Corp., D. C.App., 267 A.2d 833, 835 (1970).

We can find nothing about the *Edwards* principle which necessitates such a drastic limitation on its applicability. Indeed the prohibition against retaliatory evictions generally, without limitation to the facts of *Edwards*, and in terms applicable to *Southall Realty* rights,[1] has become part of the housing code of the District of Columbia. We see no reason why the rights protected in *Southall Realty* and *Javins* should be rendered nugatory by a restrictive reading of *Edwards* or by a judicial failure to respect the legislative will. We are therefore of the view that appellant should have been given the opportunity to prove the facts necessary to make out an *Edwards* defense and that the trial judge erred in aborting this opportunity by prematurely granting summary judgment. It follows that the decision of the District of Columbia Court of Appeals must be reversed.

### I

If lawsuits were won by perseverance alone, Diamond Housing could hardly lose this suit. Appellee has been attempting to evict Mrs. Robinson for over three and a half years. It has proceeded under no fewer than three legal theories

---

1. Housing Regulations of the District of Columbia (hereinafter cited as "Regulations") § 2910 provides:
   "No action to recover possession of a habitations [*sic*] may be brought against a tenant, nor shall an owner otherwise cause a tenant to quit a habitation involuntarily * * * in retaliation against a tenant's:
   * * * * *
   "(c) good faith assertion of rights under these Regulations, including rights under Sections 2901 or 2902."
   Section 2902.1(a) states:
   "Any letting of a habitation which, at the inception of the tenancy, is unsafe or unsanitary by reason of viola-

   tions of these Regulations with respect to the particular habitation let or the common space of the premises, whether or not such violations are subject of a notice issued pursuant to these Regulations, of which the owner has knowledge or reasonably should have knowledge, shall render void the lease or rental agreement for such habitation."
   It should be obvious from the plain language of § 2910 of the Regulations that the prohibition against retaliatory evictions applies whether the landlord's retaliation results from the tenant's complaints to the housing authorities or, as here, the tenant's successful assertion of a *Southall Realty* defense.

and has remained undaunted through an adverse jury verdict,[2] a dismissal of its action by the Court of General Sessions,[3] an adverse decision by the District of Columbia Court of Appeals,[4] and action by the District of Columbia City Council which seemingly cut the heart out of its case.[5]

The saga begins on May 2, 1968, when Mrs. Robinson and her four children moved into a row house owned by Diamond Housing in Northwest Washington. Mrs. Robinson signed a lease making her a month-to-month tenant with the apparent understanding that the landlord would repair the deteriorating condition of the premises. See Diamond Housing Corp. v. Robinson, L&T No. 62391–68, opinion and order of Judge Belson, October 16, 1968, Transcript of Record in DCCA No. 4864 at 6–7. When the landlord failed to keep this promise, Mrs. Robinson began withholding rent, and Diamond Housing sued for possession. Mrs. Robinson defended on the ground that substantial housing violations existed at the time the lease was signed and that the lease was therefore unenforceable under the principles announced in Brown v. Southall Realty Co., supra. Specifically, Mrs. Robinson introduced evidence showing that large pieces of plaster were missing throughout the house, that there was no step from the front walk to the front porch, that the front porch was shaky and unsafe, that there was a wall in the back bedroom which was not attached to the ceiling and which moved back and forth when pressed, that nails protruded along the side of the stairway, that there was a pane of glass missing from the living room window, and that the window frame in the kitchen was so far out of position that one could see into the back yard through the space between it and the wall. See Transcript of Record in DCCA No. 4864 at 7–8. At the completion of the trial, the jury returned a special verdict finding that housing code violations existed at the inception of the lease rendering the premises unsafe and unsanitary. Id. at 10–11. The trial court then granted judgment to Mrs. Robinson, as required by Southall Realty. Id. at 17.

Unwilling to admit defeat, Diamond Housing instituted a second suit for possession on the theory that, since the lease was void, Mrs. Robinson was a trespasser and hence no longer entitled to possession. When the trial court granted Mrs. Robinson's motion to dismiss,[6] Diamond Housing appealed to the District of Columbia Court of Appeals. That court affirmed, holding that "an agreement entered into in violation of the law creates no rights upon the wrongdoer. The defense of illegality does not rescind the illegal agreement, but merely prevents a party from using the courts to enforce such an agreement." Diamond Housing Corp. v. Robinson, D.C.App., 257 A.2d 492, 495 (1969). (Footnote omitted.) It followed that Mrs. Robinson, "having entered possession under a void and unenforceable lease, was not a trespasser but became a tenant at sufferance." Ibid. The court added, however, that Mrs. Robinson's tenancy, "like any other tenancy at sufferance, may be terminated on thirty days' notice. The Housing Regulations do not compel an owner of housing property to rent his property. Where, as here, it has been determined

---

2. See Diamond Housing Corp. v. Robinson, L & T No. 62391–68, opinion and order of Judge Belson, Oct. 16, 1968, at 5–6, Transcript of Record in DCCA No. 4864 at 10–11.

3. See Diamond Housing Corp. v. Robinson, L & T No. 96761–68, opinion and order of Judge Burka, Dec. 3, 1968, Transcript of Record in DCCA No. 4864 at 31.

4. See Diamond Housing Corp. v. Robinson, D.C.App., 257 A.2d 492 (1969).

5. See Regulations § 2910 ("Retaliatory Acts").

6. Judge Burka, sitting in Landlord & Tenant Branch, held that Mrs. Robinson's status as a nontrespasser had been settled in the previous action and therefore dismissed the suit as res judicata. See note 3 supra.

that the property when rented was not habitable, that is, not safe and sanitary, and should not have been rented, and if the landlord is unwilling or unable to put the property in a habitable condition, he may and should promptly terminate the tenancy and withdraw the property from the rental market, because the Regulations forbid both the rental and the occupancy of such premises." *Ibid.* (Footnote omitted.)

Seizing upon this dicta, Diamond Housing instituted a third action for possession, this time on the basis of a 30-day notice. In support of its action, Diamond filed an affidavit stating that it was unwilling to make the repairs necessary to put the housing in compliance with the housing code and that it presently intended to take the unit off the rental market. *See* affidavit of Barry Mankowitz, Transcript of Record in DCCA No. 5194 at 64. In defense, Mrs. Robinson asserted that she was being evicted in retaliation for successfully asserting her *Southall Realty* rights in the previous actions, and that the eviction was therefore illegal under the principles announced in Edwards v. Habib, *supra*. Mrs. Robinson also argued that the eviction was barred under general equitable principles since Diamond Housing, having allowed its housing to fall into disrepair, lacked the requisite "clean hands."

On this record, Diamond Housing moved for summary judgment. In an oral opinion, Judge Hyde recognized that "there wouldn't be but one way this issue [Diamond's retaliatory motive] could be decided by the jury, because as a matter of fact, I should think that if the landlord is honest at all, he would admit that he's upset, angry, wanted the tenant out of there." [7] Transcript of

Record in DCCA No. 5194 at 41. Nonetheless, the court found that "[i]t would seem to be the height of absurdity to permit retaliation, at this juncture, even to be entertained," *ibid.*, and granted Diamond's motion. *Id.* at 45.

While this decision was on appeal to the District of Columbia Court of Appeals, Mrs. Robinson apparently vacated the premises. *See* Robinson v. Diamond Housing Corp., 139 U.S.App.D.C. 339, 341, 433 F.2d 497, 499 (1970) (statement of Judge Robinson). However, the precise circumstances surrounding her move are not clear on this record. Mrs. Robinson alleges that she was forced to leave involuntarily by the continued existence of the unremedied housing code violations. *See* affidavit of Lena Robinson, Record in D.C.Cir. No. 23,850. Diamond Housing asserts that Mrs. Robinson voluntarily made the premises uninhabitable by failing to pay her heating bills which led to a discontinuance of heat and the freezing of all pipes in the building. *See* brief for appellee at 4.

Whatever the truth of these competing contentions, the District of Columbia Court of Appeals apparently found that they had no effect on the justiciability of the controversy, since that court proceeded to affirm the judgment of the Court of General Sessions on the merits. The court found that the procedures followed by Diamond were in accord with the statutory requirements for recovery of property from a tenant at sufferance and that the retaliatory defense of Edwards v. Habib, *supra*, was unavailable as a matter of law in this situation. Robinson v. Diamond Housing Corp., D. C.App., 267 A.2d 833 (1970). We thereupon granted leave to appeal, and it is this judgment which is now before us for review.[8]

---

7. Even counsel for Diamond seems to have conceded that a jury would find the landlord to have been motivated by retaliatory purposes. At one point in oral argument he stated, "Any jury is going to have to practically say that there is retaliation. Certainly, it's understandable—only human nature, that a person who can't collect the rent is going to try and get them

out. That's going to be the basic reason." Transcript of Record in DCCA No. 5194 at 39.

8. In addition to arguing that she should have been permitted to take her retaliatory eviction defense to the jury, Mrs. Robinson complains of certain procedural errors allegedly committed at the trial

## II

A panel of this court recently had occasion to observe that there is an "apparently rising incidence of possessory actions based on notices to quit following closely on the heels of possessory actions based on nonpayment of rent." Cooks v. Fowler, 141 U.S.App.D.C. 236, 240, 437 F.2d 669, 673 (1971). This trend is disturbing because, if judicially encouraged, it would vitiate tenants' rights recognized in *Southall Realty* and *Javins* and now protected by statute in the District of Columbia. *See* Regulations §§ 2902.1, 2902.2. As one commentator has observed:

> "In large measure, the scope and effectiveness of tenant remedies for substandard housing will be determined by the degree of protection given tenants against retaliatory actions by landlords. If a landlord is free to evict or otherwise harass a tenant who exercises his right to secure better housing conditions, few tenants will use the remedies for fear of being put out on the street. * * * "

Daniels, Judicial and Legislative Remedies for Substandard Housing: Landlord-Tenant Law Reform in the District of Columbia, 59 Geo.L.J. 909, 943 (1971). The *Javins* and *Southall Realty* decisions—as well as the District of Columbia regulations patterned after them —were based on the express premise that private remedies for housing code violations would increase the stock of livable low-cost housing in the District. If exercise of those remedies leads instead to eviction of tenants and abandonment of what little low-cost housing remains in the District, the great goal of "a decent home and a suitable living environment for every American family," Section 1 of the Housing Act of 1937, 50 Stat. 888, as amended by the Housing Act of 1949, 63 Stat. 413, will

be frustrated. *Cf.* 84 Harv.L.Rev. 729, 733–734 (1971).

Of course, if the housing market is structured in such a way that it is impossible for landlords to absorb the cost of bringing their units into compliance with the housing code, there may be nothing a court can do to prevent vigorous code enforcement from driving low-cost housing off the market.[9] But the most recent scholarship on the subject indicates this danger is largely imagined. In fact, it appears that vigorous code enforcement plays little or no role in the decrease in low-cost housing stock. When code enforcement is seriously pursued, market forces generally prevent landlords from passing on their increased costs through rent increases. *See generally* Ackerman, Regulating Slum Housing Markets On Behalf of the Poor: Of Housing Codes, Housing Subsidies and Income Redistribution Policy, 80 Yale L.J. 1093 (1971). The danger stems not from the possibility that landlords might take low-cost units off the market altogether, but rather from the possibility that they will do so selectively in order to "make an example" of a troublesome tenant who has the temerity to assert his legal rights in court. We can be fairly confident that most landlords will find ownership of property sufficiently profitable—even with vigorous code enforcement—to remain in business. But it is undoubtedly true that the same landlords would be able to make a greater profit if the housing code were enforced laxly or not at all. There is thus a real danger that landlords may find it in their interest to sacrifice the profits derived from operation of a few units in order to intimidate the rest of their tenants.

Fortunately, this is a danger with which the law is better equipped to deal. While the judiciary may be powerless to

---

level. *See* brief for appellant at 10–17. In view of our holding that the trial court erred in granting summary judgment over a retaliatory eviction defense, we find it unnecessary to rule on these questions of local procedure.

9. This is not to say that legislative solutions are necessarily impossible in this situation. *See, e. g.,* 5 D.C.Code § 315 (1967) (municipal repair of buildings).

control landlords who no longer wish to remain landlords, it can prevent landlords from conducting their business in a way that chills the legally protected rights of tenants. *Cf.* Textile Workers Union v. Darlington Manufacturing Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). Indeed, this court's decision in Edwards v. Habib, *supra*, was premised on the belief that retaliatory evictions had a "chilling effect" on assertion of rights protected by the housing code, and that the courts could and should eliminate this inhibition. The *Edwards* court expressly recognized the vital role which private tenants play in the District's system of housing code enforcement, and held that it would violate congressional intent to permit eviction of tenants for the purpose of preventing exercise of private remedies.

■■ It would thus appear, at first blush at least, that the *Edwards* principle should control disposition of this case. Applying this principle Diamond Housing would prevail if it were able to prove to the satisfaction of a jury that it evicted Mrs. Robinson because it could not afford to repair the premises, or for some other valid reason, or for no reason at all. But questions of motivation are particularly inappropriate for resolution on a motion for summary judgment. *See* Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). There is also the possibility—indeed, the trial judge viewed it as a near certainty [10]—that the jury would find Mrs. Robinson's eviction to be based on an illicit motive. Given the legal sufficiency of the *Edwards* defense, Mrs. Robinson should have been permitted to make her case if she could, and the factual issue should have been left in the hands of a jury.

This argument assumes, however, that an *Edwards* defense is in fact legally sufficient in this situation. Although the broad principles which underlie *Edwards* would seem squarely applicable, it is possible that something special about this fact pattern would make it unwise or impermissible to utilize *Edwards* here. Diamond Housing takes the position that this case is, in fact, special and that the special circumstances surrounding it make an application of *Edwards* unjust. Diamond's argument begins with the premise—apparently shared by the District of Columbia Court of Appeals [11]—that *Edwards* should be narrowly "limited to its facts." Since *Edwards* involved reporting of code violations to city officials while this case involves setting up those violations as a defense to an action for eviction, it is contended that *Edwards* does not compel reversal here. Moreover, Diamond argues that, even if *Edwards* is more broadly read, it still should not be applied to a case such as this where the landlord is prevented from collecting rent by *Southall Realty*, refuses to repair the premises, and wishes to take the housing off the market altogether. Closely allied to this contention is the further argument that Mrs. Robinson is precluded from remaining in possession by Section 2301 of the Housing Regulations which makes it illegal to occupy premises which are in violation of the Regulations. Finally, Diamond argues that in any event this case is now moot since Mrs. Robinson has voluntarily surrendered possession and Diamond has chosen to forego any claim it might have to back rent.

■ We have carefully examined each of these arguments and have concluded that none of them sufficiently distinguishes this case from *Edwards* or precludes application of the District of Columbia law against retaliatory evictions. If we resolve all reasonable doubts in favor of appellant—as we must when reviewing a summary judgment,[12] *see, e.*

10. *See* text at note 7 *supra.*

11. *See* 267 A.2d at 835.

12. This rule is not changed by the fact that Mrs. Robinson failed to submit counter-

affidavits. Where, as here, the affidavits submitted by the movant are insufficient as a matter of law, the opponent's failure to counter them can have no relevance. Moreover, since the movant's affidavits

g., United States v. Diebold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); United States v. Farmers Mutual Ins. Ass'n of Kiron, Iowa, 8 Cir., 288 F.2d 560, 562 (1961)—it becomes plain that a jury might find Diamond Housing to be using the eviction machinery to punish Mrs. Robinson for exercising her legal rights. *Edwards* squarely holds that the state's judicial processes may not be so used, and nothing which has transpired since *Edwards* was decided has caused us to change our view. Indeed, if anything, the creation by the District of Columbia City Council of new private remedies for code violations since *Edwards* reinforces our belief in the necessity for a broad retaliatory eviction defense. If the housing code were effectuated solely by a system of comprehensive public enforcement, the situation might perhaps be different. But by legislating a system of private remedies conforming to the *Javins*[13] and *Southall Realty*[14] decisions, the City Council has made plain that the code is to be enforced in large part through the actions of private tenants. Having put at least some of its eggs in the private enforcement basket,[15] the legislature should not at the same time be taken as having authorized use of legal processes by those who seek to frustrate private enforcement. The right to a decent home is far too vital for us to assume that government has taken away with one hand what it purports to grant with the other.

A. The Narrow Reading of *Edwards*.

■ It must be conceded, of course, that the facts in *Edwards* were somewhat different from the facts here. In *Edwards* the landlord sought to evict a month-to-month tenant because she had reported housing code violations to the city. Here, the landlord seeks to evict a tenant at sufferance because she successfully set up housing code violations in a previous action for possession. But the question before us is not whether there exists *any* difference between *Edwards* and our case; it is, rather, whether a *relevant* difference exists. Every case is "limited to its facts," if by that phrase one means that the court based its judgment on the facts presented to it. But most cases are also decided with reference to some more general normative principle which extends beyond the specific circumstances of the case before the court. Indeed, it is the existence of such broader norms which distinguishes a decision which is principled and rational from one which is *ad hoc* and arbitrary.

Thus the issue which separates the parties is not whether this case is "different" from *Edwards*, but rather whether anything about the case takes it out of the general principle enunciated in *Edwards*. It is therefore insufficient merely to announce, as the District of Columbia Court of Appeals did, that *Edwards* should be "limited to its facts." This statement only begs the question of *which* facts should set the principled limits on the *Edwards* doctrine. We shall postpone until Section B *infra* any discussion of whether the landlord's inability to receive rent and desire to take his unit off the market are such facts and are hence sufficient to take this case out of the *Edwards* rule. For now, it suffices to note that we can see no reason why anything should turn on the different legal status of this tenant or the different use to which she put the Housing Regulations. A tenant at sufferance, like a month-to-month tenant, can be evicted at the expiration of 30 days for any legitimate reason or for no

assert matters concerning the affiant's motive and intention, failure to counter them does not necessitate acceptance of their contents as true. *See, e. g.*, Cellini v. Moss, 98 U.S.App.D.C. 114, 116, 232 F.2d 371, 373 (1956); Subin v. Goldsmith, 2 Cir., 224 F.2d 753, 759 (1955).

13. *See* Regulations § 2902.1(a).

14. *See id.* § 2902.2.

15. *See id.* § 2901.2: "It is * * * declared that the abatement of [housing code violations] by criminal prosecution or by compulsory repair, condemnation and demolition alone has been and continues to be inadequate."

reason. But both types of tenants are guaranteed the same rights by the housing code, and both play a role in the private enforcement mechanism established by the City Council. That mechanism depends in part on the right to withhold rent when a unit is rendered unsafe and unsanitary by substantial housing code violations. *See* Regulations §§ 2902.1, 2902.2. This right would be shallow indeed if the landlord were free to penalize its exercise by eviction. In fact, if the new right were so burdened, it is hard to see how it would be new at all, since a tenant has always had the dubious "right" to refuse payment of rent and thereby risk eviction. Surely, then, the legislature no more intended to permit retaliatory evictions as punishment for rent withholding than it intended to permit such evictions as punishment for reporting housing code violations.

Some version of the *Edwards* rule is now the law in numerous jurisdictions. The widespread adoption of the rule, by both courts [16] and legislatures,[17] stands as convincing testimony to the pervasive feeling that retaliatory evictions are inconsistent with a sensible and humane housing policy. Indeed, some courts have thought the rule so fundamental as to reach constitutional magnitude—a ground for decision suggested, but not relied upon, by the *Edwards* court itself.

*See* 130 U.S.App.D.C. at 129–137, 397 F.2d at 690–698.[18]

We cannot ignore these constitutional considerations lurking in the background of this case. Nevertheless, it is unnecessary for us to reach the constitutional argument, since the legislative intent is now even clearer than it was when *Edwards* was decided. Section 2910 of the District's Housing Regulations provides:

"No action to recover possession of a habitations [*sic*] may be brought against a tenant, nor shall an owner otherwise cause a tenant to quit a habitation involuntarily * * * in retaliation against a tenant's:

\* \* \* \* \* \*

"(c) good faith assertion of rights under these Regulations, including rights under Sections 2901 or 2902."

Section 2902.1(a), in turn, provides:

"Any letting of a habitation which, at the inception of the tenancy, is unsafe or unsanitary by reason of violations of these Regulations with respect to the particular habitation let or the common space of the premises, whether or not such violations are subject of a notice issued pursuant to these Regulations, of which the owner has knowledge or reasonably should have knowledge, shall render void the

16. *See, e. g.,* Hosey v. Club Van Cortlandt, S.D.N.Y., 299 F.Supp. 501 (1969); Dickhut v. Norton, 45 Wis.2d 389, 173 N.W.2d 297 (1970); Alexander Hamilton Savings & Loan Ass'n v. Whaley, 107 N.J.Super. 89, 257 A.2d 7 (1969).

17. *See, e. g.,* Conn.Gen.Stat.Ann. § 52–540a (Supp.1969); Ill.Rev.Stat. ch. 80, § 71 (1971); Mass.Gen.Laws Ann. ch. 186, § 18 (Supp.1970); N.J.Stat.Ann. title 2A: 42–10.10, 42–10.12 (Supp.1971); Purdon's Penna.Stat.Ann. title 35, § 1700–1 (Supp.1971). *Cf.* American Bar Foundation, Model Residential Landlord-Tenant Code § 2–407 (tent. draft 1969).

18. Thus the District Court for the Southern District of New York found:
    "The effect that a rule of law permitting retaliatory evictions would have on tenants cannot be discounted. There would be no point in a tenant trying to improve conditions in a building that he would not be allowed to continue to live in. Permitting retaliatory evictions would thus inhibit him in the exercise of his constitutional rights or, in the words of the Supreme Court, have a chilling effect.
    "We accordingly hold that the 14th amendment prohibits a state court from evicting a tenant when the overriding reason the landlord is seeking the eviction is to retaliate against the tenant for an exercise of his constitutional rights."
    Hosey v. Club Van Cortlandt, *supra* note 16, 299 F.Supp. at 506. (Footnotes omitted.) *Cf.* McQueen v. Druker, 1 Cir., 438 F.2d 781 (1971); Abstract Investment Co. v. Hutchinson, 204 Cal.App.2d 242, 22 Cal.Rptr. 309 (1962). *But cf.* Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972); Hill v. Miller, 64 Cal.2d 757, 51 Cal.Rptr. 689, 415 P.2d 33 (1966).

lease or rental agreement for such habitation."

It is thus clear that the City Council has forbidden evictions in retaliation for assertion of a *Southall Realty* defense— the very thing which the District of Columbia Court of Appeals purports to allow.[19] It may be, as the trial judge found, that "[i]t would seem to be the height of absurdity to permit retaliation, at this juncture, even to be entertained." Transcript of Record in DCCA No. 5194 at 41. But that is a policy question which has now been resolved by the City Council in a manner contrary to the trial judge's observation, and the courts must defer to this resolution of the issue.

**B. Diamond's Unwillingness to Repair.**

It must nonetheless be conceded that implementing the legislative will in this fact situation leads to some difficulties and ambiguities. For example, Diamond Housing argues that permitting a retaliatory eviction defense here may mean that it will never be able to recover possession of its property. Nonreceipt of rent is a continuing injury, Diamond argues, and it will always want to remove the tenant so as to remove the source of injury. Yet ironically, so long as it is motivated by this goal, the *Edwards* defense will prevent achievement of it. Thus Diamond fears that its shotgun marriage to Mrs. Robinson may last till death do them part.

Moreover, Diamond points out, it is not trying to evict Mrs. Robinson so that it may rent the premises to someone else. It does not want a quickie divorce in order to permit a hasty remarriage. Rather, if freed from Mrs. Robinson, Diamond promises to beat a strategic retreat to a monastery where it

will go and sin no more. Thus Diamond says that it intends to take the unit off the market altogether when Mrs. Robinson leaves—the very thing which this court has suggested a landlord do when he is unwilling or unable to repair the premises. *See* Whetzel v. Jess Fisher Management Co., 108 U.S. App.D.C. 385, 392, 282 F.2d 943, 950 (1960). There is nothing in the Housing Regulations which prevents it from going out of business, Diamond argues. Whatever limitations the law imposes on how it chooses its tenants, Diamond claims an absolute right to choose not to have any tenants.

■■ In order to clarify these and other ambiguities inherent in the *Edwards* defense, attorneys for Mrs. Robinson have suggested that we formulate comprehensive guidelines for the circumstances under which a landlord may evict his tenants when the premises contain unremedied housing code violations. *Cf.* American Bar Foundation, Model Residential Landlord-Tenant Code § 2-407 (tent. draft 1969). We respectfully decline this invitation. We do so primarily because we think the *Edwards* rule, as supplemented by District law, is largely self-explanatory and its ramifications are best elucidated on a case-by-case basis. We are also motivated, however, by the fear, generated in part by this case, that any such guidelines would become the basis for mechanical legal decisions by judges, whereas we believe the matter is best left to the sound discretion of juries under proper instructions. Whether the landlord's action is retaliatory is, after all, a question of fact, *see* Edwards v. Habib, *supra*, 130 U.S.App.D.C. at 141, 397 F.2d at 702, and we would not be justified in taking it away from the jury merely because it is "hard." *Cf.* United States v. Leazer,

---

19. We need not reach the question whether § 2910 should be retroactively applied to eviction procedures begun before its enactment, since we believe the section is no more than an explicit statement of the legislative policy implicit in the very existence of housing regulations. *See* Edwards

v. Habib, 130 U.S.App.D.C. 127, 138–142, 397 F.2d 687, 699–703 (1968). It should be noted, however, that at the time the DCCA sought to limit our decision in *Edwards* "to its facts," § 2910 was part of the Housing Regulations of the District of Columbia.

148 U.S.App.D.C. 356, 361, 460 F.2d 864, 869 (1972) (Chief Judge Bazelon, concurring). As the Supreme Court has made plain, "Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'" Poller v. Columbia Broadcasting System, Inc., *supra*, 368 U.S. at 473, 82 S.Ct. at 491. This is especially true where, as here, the matter for decision involves a complex of moral and empirical judgments best left in the hands of representatives of the community as a whole. *Cf.* United States v. Bennett, 148 U.S.App.D.C. 364, 368, 460 F.2d 872, 876 (1972).

■ But while we are unwilling to write comprehensive guidelines for application of the *Edwards* defense, we do feel it may be useful to clarify some of the confusion which has evidently surrounded it. These clarifications should, in turn, be incorporated into appropriate instructions which the trial judge should give to the jury when it considers the underlying factual question. First, then, it should be noted that the *Edwards* defense deals with the landlord's subjective state of mind—that is, with his motive. If the landlord's actions are motivated by a desire to punish the tenant for exercising his rights or to chill the exercise of similar rights by other tenants, then they are impermissible.

■ It is commonplace, however, that a jury can judge a landlord's state of mind only by examining its objective manifestations. *See* Ackerhalt v. Smith, D.C.Mun.App., 141 A.2d 187, 189 (1950). Thus when the landlord's conduct is "inherently destructive" of tenants' rights, or unavoidably chills their exercise, the jury may, under well recognized principles, presume that the landlord intended this result. *Cf.* NLRB v. Brown, 380 U.S. 278, 287, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); NLRB v. Erie Resistor Corp., 373 U.S. 221, 228, 231, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). An unexplained eviction following successful assertion of a *Javins* or *Southall Realty* defense falls within this inherently de-

structive category and hence gives rise to the presumption. Once the presumption is established, it is then up to the landlord to rebut it by demonstrating that he is motivated by some legitimate business purpose rather than by the illicit motive which would otherwise be presumed. *See* Edwards v. Habib, *supra*, 130 U.S.App.D.C. at 141 n. 53, 397 F.2d at 702 n. 53. *Cf.* NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 33, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). We wish to emphasize, however, that the landlord's desire to remove a tenant who is not paying rent is not such a legitimate purpose. *Southall Realty* and the housing code guarantee the right of a tenant to remain in possession without paying rent when the premises are burdened with substantial housing code violations making them unsafe and unsanitary. The landlord of such premises who evicts his tenant because he will not pay rent is in effect evicting him for asserting his legal right to refuse to pay rent. This, of course, is the very sort of reason which, according to *Edwards* and the housing code, will not support an eviction.

■ Thus Diamond Housing is correct when it asserts it will never be able to evict Mrs. Robinson so long as it is motivated by a desire to rid itself of a tenant who is not paying rent. But it does not follow that Diamond will be burdened by its unwanted tenant forever. If Diamond comes forward with a legitimate business justification—other than the mere desire to get rid of a tenant exercising *Southall Realty* rights—it may be able to convince a jury that it is motivated by this proper concern. For example, if Diamond brought the premises up to housing code standards so that rent was again due and then evicted the tenant for some unrelated, lawful reason, the eviction would be permissible. Similarly, if Diamond were to make a convincing showing that it was for some reason impossible or unfeasible to make repairs, it would have a legiti-

mate reason for evicting the tenant and taking the unit off the market.[20]

■ It does not follow, however, that mere desire to take the unit off the market is by itself a legitimate business reason which will justify an eviction. Expression of such a desire begs the further question of why the landlord wishes to remove the unit. If he wishes to remove the unit for some sound business reason, then of course he is free to do so. But such a removal, following a tenant's *Southall Realty* defense, is as inherently destructive of tenants' rights as an ordinary eviction. Therefore, a landlord who fails to come forward with a substantial business reason for removing a unit from the market—such as, for example, his financial inability to make the necessary repairs [21]—may be presumed to have done so for an illicit reason.[22]

■ Diamond argues that such a ruling is precluded by this court's previous statement in Whetzel v. Jess Fisher Management Co., *supra*, 108 U.S.App.D. C. at 392, 282 F.2d at 950: "§ 2301 [of the housing code] imposes upon the [landlord] a duty of care toward its tenants. This duty can be satisfied either by making the necessary repairs or by terminating use of the premises as a place of human habitation." But Diamond's assertions to the contrary notwithstanding, this statement does not give the landlord *carte blanche* so long as he can point to the existence of some housing code violations. Nor does it establish the absolute right of the landlord to remove a unit from the market when he does so for an unlawful purpose. We adhere to the *Whetzel* court's suggestion

that the landlord may terminate use of a unit which is burdened with housing code violations, but we reject the argument that the *Whetzel* dicta is sufficient to turn an otherwise unlawful eviction into a lawful one. As we explained in *Javins*, "Our holding * * * affects only eviction for nonpayment of rent. The landlord is free to seek eviction at the termination of the lease or on any other *legal* ground." 138 U.S.App.D.C. at 381 n. 64, 428 F.2d at 1083 n. 64. (Emphasis added.) An eviction grounded on a desire to punish a tenant's exercise of *Southall Realty* rights is plainly illegal, and its illicit status remains unchanged even if it is accompanied by withdrawal of the unit from the housing market.

■ It should be plain from the above discussion that the landlord's assertion that he wishes to remove the property from the market, even when coupled with the assertion that he is unwilling to remedy housing code violations, is legally insufficient to justify summary judgment over a *Southall Realty* defense. Indeed, the offer to take the unit off the market is totally irrelevant to the issue of motive unless it is accompanied by the further declaration that the landlord is unable to correct housing code violations which preclude his receipt of rent. But while inability to repair *is* a legitimate business reason which would justify removing the unit from the market, even this allegation is not sufficient to justify summary judgment. We should remember that summary judgment "is not a catch penny contrivance to take unwary litigants into its toils and deprive them of a trial, it is

---

20. We do not mean to suggest, however, that it would be permissible for Diamond to make a showing that it is unable to repair the premises and then evict Mrs. Robinson in order to rent to another tenant. Such a course of action is perhaps the most destructive of tenants' rights of all, since it can be explained only in terms of a desire to punish the complaining tenant. It would be permissible, however, for Diamond to force Mrs. Robinson to vacate on a temporary basis if it could show that

repair of the premises was not feasible while she remained in possession.

21. We do not mean to suggest that this is the only legitimate business reason for taking a unit off the market. The legitimacy of other reasons can be decided as they are asserted on a case-by-case basis.

22. The same principles, of course, apply to retaliatory sale of the premises if the sale is intended to lead to ultimate eviction of the tenant.

a liberal measure, liberally designed for arriving at the truth. Its purpose is not to cut litigants off from their right of trial by jury if they really have evidence which they will offer on trial, it is to carefully test this out, in advance of trial by inquiring and determining whether such evidence exists." Whitaker v. Coleman, 5 Cir., 115 F.2d 305, 307 (1940).

Thus the landlord's mere allegation that he is removing the unit from the market because he cannot afford to make repairs does not mean that the jury will find that he is *in fact* unable to make the necessary repairs. Moreover, even if the jury makes such a finding, it still does not follow that judgment for the landlord is compelled. We must remember that we are dealing with a question of subjective motive, and that objective factors are relevant only as indicia of motive. Thus the mere existence of a legitimate reason for the landlord's actions will not help him if the jury finds that he was in fact motivated by some illegitimate reason. *Cf.* Williams v. Allen, 5 Cir., 439 F.2d 1398 (1971). In cases of mixed motives, the jury will have the difficult task of weighing one against the other and determining which was the causative factor. *Cf.* Textile Workers Union v. Darlington Manufacturing Co., *supra,* 380 U.S. at 268–269, 85 S.Ct. 994.

None of this is to say that the landlord may not go out of business entirely if he wishes to do so or that the jury is authorized to inspect his motives if he chooses to commit economic harakiri. There would be severe constitutional problems with a rule of law which required an entrepreneur to remain in business against his will. But in a closely analogous area, the Supreme Court has distinguished sharply between a businessman's absolute right to go out of business altogether and his more limited right to discontinue part of his enterprise so as to benefit the rest of it.

"The closing of an entire business, even though discriminatory, ends the employer-employee relationship; the force of such a closing is entirely spent as to that business when termination of the enterprise takes place. On the other hand, a discriminatory partial closing may have repercussions on what remains of the business, affording employer leverage for discouraging the free exercise of § 7 rights among the remaining employees * * *. * * *"

Textile Workers Union v. Darlington Manufacturing Co., *supra,* 380 U.S. at 274–275, 85 S.Ct. at 1002. Thus we hold that the landlord's right to discontinue rental of all his units in no way justifies a partial closing designed to intimidate the remaining tenants.[23]

C. The Relevance of Section 2301.

It must be recognized that in some situations exercise of the sort of *Edwards* defense outlined above may lead to an impasse. If the landlord is unwilling, but not unable, to repair code violations, he will probably be prevented from either evicting the tenant or collecting rent. The result arguably might be a tenant who lives indefinitely in

---

**23.** Nothing in the Supreme Court's recent decision in Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), changes our view in this regard. In that case, the Supreme Court refused to enjoin closing of a municipal swimming pool despite appellants' argument that such a closing, shortly after a desegregation order, would chill exercise of 14th Amendment rights. But the Court based its decision almost entirely on the impropriety of examining the legislative motive behind closing of the pool. *See* 403 U.S. at 224–226, 91 S.Ct. 1940. *Cf.* United States v. O'Brien, 391 U.S. 367, 383, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). *But cf.* Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). There is, of course, no similar difficulty inherent in judicial examination of the motivation of private landlords. *See, e. g.,* Edwards v. Habib, *supra* note 19; United States v. Bruce, 5 Cir., 353 F.2d 474 (1965); United States v. Beaty, 6 Cir., 288 F.2d 653 (1961).

substandard premises without paying the landlord for the leasehold interest.[24]

Diamond argues that such a solution represents poor public policy and a poor reading of the applicable statutes. So long as the landlord is not receiving rent, the argument goes, he will certainly not be able to finance repairs. Yet so long as he cannot make repairs, he will not be able to collect rent. Unable to break out of this vicious circle, the landlord is likely to abandon the building altogether without even bothering with an attempted eviction. Diamond contends that this unfortunate result was wisely precluded by the legislature when it approved Section 2301 of the housing code: "No owner, licensee, or tenant shall occupy or permit the occupancy of any habitation in violation of these regulations." Diamond argues that since this section prohibits Mrs. Robinson from remaining in her house and Diamond from allowing her to remain there, an eviction must be proper even though —indeed, for the very reason that— there are unremedied housing code violations on the premises.

■■■■ Although superficially persuasive, on closer analysis this argument turns out to be built on a series of *non sequiturs*. Section 2301 cannot be read in isolation. It is part of a larger scheme which is clearly designed to protect tenants and encourage them to demand their rights, not to punish them. True, Section 2301 makes it illegal for a tenant to remain in a unit burdened with code violations, and there are procedures available through which the city government can force such a tenant to vacate the premises. *See* 5 D.C.Code § 508 (1967); Regulations § 3301. But it does not follow that Section 2301 should therefore be interpreted as authorizing retaliatory evictions by landlords, particularly where another section of the same code makes retaliatory evictions unlaw-

ful. The housing code plainly places the primary responsibility for repair of housing violations on the landlord. *Cf.* Javins v. First National Realty Corp., *supra*; Kanelos v. Kettler, 132 U.S.App. D.C. 133, 138, 406 F.2d 951, 956 (1968). Under ordinary estoppel principles, the landlord can hardly rely on his own wrongful neglect of this duty as a ground for evicting his tenant. *Cf., e. g.*, Brant v. Virginia Coal & Iron Co., 93 U.S. (3 Otto) 326, 23 L.Ed. 927 (1876); Russell v. Texas Co., 9 Cir., 238 F.2d 636 (1956), *cert. denied*, 354 U.S. 938, 77 S.Ct. 1400, 1 L.Ed.2d 1537 (1957). Indeed, such principles of estoppel underlie the opinions of this court in *Edwards* and *Javins* and of the District of Columbia Court of Appeals in *Southall Realty* since in all of those cases the landlord was prevented from evicting his tenant despite housing code violations which put the premises within the scope of Section 2301.

■■■ Nor is Diamond helped by the language in Section 2301 prohibiting landlords from "permit[ting] the occupancy" of premises with code violations. Diamond argues that it can hardly be required to do something which the law itself prohibits. But the suppressed premise in this reasoning is that Diamond can avoid violating Section 2301 only by evicting the tenant. If this were in fact true—that is, if Diamond were unable to repair the premises— then, under the principles outlined above, an eviction would be permissible.[25] But Diamond has failed to show that that situation is posed by this case. If the landlord is able to repair the premises, another method is available to him for complying with the requirements of Section 2301. Since a retaliatory eviction would be unlawful under *Edwards* and under the housing code, the landlord must *choose the only lawful method of*

24. This puts to one side the possibility, which need not be discussed here, that the landlord may be able to secure payment for the actual value of the leased premises on a *quantum meruit* theory.

25. Provided, of course, that Diamond took the unit off the market. *See* note 20 *supra*.

compliance—*i. e.*, he must repair the premises.

Thus it is clear that Diamond cannot utilize Section 2301 to overcome an *Edwards* defense and justify an eviction. Nonetheless, if we accepted Diamond's assertion that our ruling today would lead to many families living indefinitely in substandard housing without paying rent, we would be deeply troubled. Even if the landlord is estopped from asserting Section 2301, it is still clear that that section expresses a public policy against long term occupancy of substandard housing. We would be evading our duty if our decision were to undermine this legislatively declared goal.

Fortunately, however, we do not share Diamond's gloomy assessment of the effects of our decision. All substandard housing in the District can be divided into two categories: those units which the landlord is unable to repair, and those units which the landlord could, but will not, repair. We submit that nothing in our decision today necessitates long term occupancy of housing in either of these categories. In situations where the landlord is unable to repair the premises, he has a legitimate business justification for taking the unit off the market, and he can therefore meet his responsibility under Section 2301 by evicting his tenants. In situations where the landlord is able but unwilling to repair the premises, he has, by hypothesis, made them uninhabitable and hence constructively deprived the tenant of possession. *See* Goldsmith v. Gisler, D.C.Mun.App., 150 A.2d 462 (1959); Ackerhalt v. Smith, *supra*, 141 A.2d 187; Lalekos v. Manset, D.C.Mun.App., 47 A.2d 617 (1946). It should be obvious that a landlord may no more constructively evict a tenant for retaliatory purposes

than he may actually so evict him. It follows that if the tenant is entitled to possession, he is also entitled to have the premises made habitable through a code enforcement action by housing authorities or a proper suit by the tenant.[26]

It is clear, then, that whether the landlord is unable to repair the premises or simply unwilling, the policy of Section 2301 can be respected without authorizing evictions which violate *Southall Realty, Edwards*, and the housing code itself. We must keep constantly in mind that the purpose of the housing code is to increase rather than decrease the stock of habitable housing in the District of Columbia. Given this purpose, it would be surprising indeed if the code blocked development of fair and effective weapons to fight the mounting housing crisis.

D. Mootness.

With this background, it is now possible to assess Diamond's final argument. Diamond contends that this controversy is now moot because Mrs. Robinson has left the premises. But if, as Mrs. Robinson claims, her departure was necessitated by Diamond's continued failure to repair code violations, the case is still very much alive. As discussed above, such a failure would constitute a constructive eviction of Mrs. Robinson. Diamond can hardly insist that it is entitled to legal possession because it has wrongfully seized actual possession. If the seizure of actual possession were sufficient to moot out a controversy over legal possession, a thief could never be forced to surrender the property he had stolen.

Diamond Housing, however, presents a somewhat different version of the facts. Diamond claims that Mrs.

---

26. *See* Javins v. First National Realty Corp., 138 U.S.App.D.C. 369, 380 n. 61, 428 F.2d 1071, 1082 n. 61 (1970) ("In extending all contract remedies for breach to the parties to a lease, we include an action for specific performance of the landlord's implied warranty of habitability."); Regulations § 2901.5 ("It is the intention of this Section to declare expressly a public policy in favor of speedy abatement of [housing code violations], *if necessary, by preliminary and permanent injunction issued by Courts of competent jurisdiction.*"). (Emphasis added.) *Cf.* 5 D.C.Code § 618 (1967).

Robinson was forced to leave the premises when her own failure to provide heat caused all the pipes in the building to freeze. If this version is correct, then the controversy is indeed moot. The tenant's voluntary relinquishment of possession ends the case or controversy when, as here, the landlord makes no claim for back rent. *See* Gaddis v. Dixie Realty Co., 136 U.S.App.D.C. 403, 420 F.2d 245 (1969). While it is true that Mrs. Robinson's departure under the circumstances described by Diamond might in some sense be thought involuntary, the landlord should not be held responsible for the tenant's misconduct. *See* Javins v. First National Realty Corp., *supra*, 138 U.S.App.D.C. at 380 n. 62, 428 F.2d at 1082 n. 62. A tenant who makes her own apartment uninhabitable can, for our purposes, be taken as having voluntarily surrendered possession, thus mooting out the controversy.

The District of Columbia Court of Appeals seems to have found mootness to be no bar to justiciability, however, since it reached a decision on the merits. Of course, that court's decision is not binding upon us, particularly where, as here, it was made *sub silentio*. But that court's willingness to reach the merits despite the existence of the same facts in the record which are now argued to make the case moot is nonetheless of some persuasive force.

Although there is substantial evidence as to the condition of the premises during the time Mrs. Robinson occupied them,[27] the record is not complete, particularly as to the precipitating cause of her leaving. Under the circumstances, it would be improper for us on the basis of cross-affidavits to attempt resolution of the factual controversy underlying the mootness claim on appeal. Since this case must be remanded in any event, the trial court[28] should be permitted to determine whether Mrs. Robinson's departure was caused by her own actions or by the code violations.[29] In the interest of expediting this already lengthy controversy, we have set out the alternative courses which the trial court should follow after the mootness issue is decided. If it finds that Mrs. Robinson voluntarily left the premises, it should vacate the initial judgment, thus leaving the landlord in possession. *See* United States v. Munsingwear, Inc., 340 U.S. 36, 39–40, 71 S.Ct. 104, 95 L.Ed. 36 (1950); Gaddis v. Dixie Realty Co., *supra*. If, on the other hand, it finds that code violations caused Mrs. Robinson's departure, it should set the case for trial on the issue of retaliatory eviction. The jury's evaluation of that defense will then determine the question of legal possession.

### III

We do not pretend that allowing Mrs. Robinson to assert an *Edwards* defense

---

27. We note that the jury verdict at the close of Diamond's initial suit establishes that substantial housing code violations existed on the premises while Mrs. Robinson was still living there. Given the severity of these violations, it is possible they alone would be sufficient to force Mrs. Robinson to give up possession, quite apart from any additional damage to the property which Mrs. Robinson might have later inflicted.

28. The trial court should determine in its discretion whether to submit these issues to a jury or try them itself. *Cf.* Gibbs v. Buck, 307 U.S. 66, 71–72, 59 S.Ct. 725, 83 L.Ed. 1111 (1939).

29. On remand, the trial court should also investigate Mrs. Robinson's contention, made at oral argument and not denied by

appellee, that Diamond has now repaired the premises in question and rented them to another tenant. Such a course of conduct would be directly contrary to the sworn affidavit of Diamond's vice president wherein he stated that Diamond was unwilling to make repairs and intended to take the unit off the market. *See* affidavit of Barry Mankowitz, Transcript of Record in DCCA No. 5194 at 64. If Diamond has in fact repaired and re-rented the unit, its actions not only undermine the credibility of its officers; they also strongly support Mrs. Robinson's allegations of a retaliatory intent. *See* note 20 *supra*. And there are, of course, stringent penalties available to punish a party who deliberately obstructs justice by falsifying affidavits.

will solve the housing crisis in the District of Columbia. That crisis is the product of a constellation of social and economic forces over which no court—and indeed perhaps no legislature—can exercise full control. But while the judicial process is not a *deus ex machina* which can magically solve problems where the legislature and the executive have failed, neither is it a mere game of wits to be played without regard for the well-being of the helpless spectators. We cannot expect judges to solve the housing dilemma, but at least they should avoid affirmative action which makes it worse. The District's legislative body has formulated a comprehensive plan, including criminal sanctions, public inspections, subsidies and rent withholding, to tackle our housing difficulties. In the end, that plan may not work. But if it fails, at least the failure should be caused by inherent weaknesses rather than by judicial subversion.

Thus all we hold today is that when the legislature creates a broad based scheme for dealing with a problem in the public interest, courts should not permit private, selfishly motivated litigants to undermine it. This result is required by the clear wording of the applicable statute, by the dictates of legislatively declared social policy, and, in the final analysis, by respect for the separation of powers and the rule of law.

Reversed and remanded with instructions.

ROBB, Circuit Judge (dissenting):

This controversy between a landlord and a tenant is peculiarly a local matter. By the Court Reorganization Act of 1970 (11 D.C.Code 1971, § 11–101 et seq.) Congress has confided to the local courts jurisdiction over such controversies and the problems they engender. This case comes to us only because of the fortuitous circumstance that the judgment of the District of Columbia Court of Appeals was entered July 20, 1970, approximately six months before the Court Reorganization Act of July 29,

1970 became effective. See 11 D.C.Code § 11–301(2). I venture to suggest that in light of the congressional intent expressed in the Act we should leave the solution of such local problems to the District of Columbia courts; we should not use this old case in an attempt to impose our views on the local judges.

Turning to the substance of the majority opinion I disagree on several fundamental points.

The landlord, Diamond Housing, served a proper notice to quit on a tenant by sufferance, who refused to pay rent. D.C.Code 1967, § 45–904. In the ensuing action for possession the tenant answered, claiming that the action was retaliatory and demanding a jury trial. The landlord moved for summary judgment, supporting the motion with an affidavit referring to the notice to quit and stating that the landlord was unwilling to make any repairs to the property and did not presently wish to rent it. No affidavit in opposition was filed by the tenant, and the court accordingly granted the motion for summary judgment. I think this ruling was correct, because there was no material issue of fact as to the landlord's motive.

I cannot accept the proposition espoused by the majority that when a landlord states under oath and without contradiction that he wishes to remove a housing unit from the market it will be presumed that his reasons are "illicit", unless he is able to prove to the satisfaction of a jury that he is financially unable to make necessary repairs or has some other "substantial business reason" for removing the unit from the market. I find no warrant in law for any such presumption or requirement of proof.

The theory of the majority seems to be that if not an outlaw a landlord is at least a public utility, subject to regulation by the court in conformity with its concept of public convenience and necessity. I reject that notion, which in practical application will commit to the discretion of a jury the management of a landlord's business and property.

The majority suggests that its decision will promote the development of more and better low-cost housing. This reasoning passes my understanding. In my judgment the majority's Draconian treatment of landlords will inevitably discourage investment in housing for rental purposes.

I dissent. I would affirm the judgment of the District of Columbia Court of Appeals.