**Talley R. HOLMES, Jr., Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**No. 13971.**

District of Columbia Court of Appeals.

Argued December 11, 1979.

Decided July 25, 1980.

Dennis M. Hart, Washington, D. C., with whom Kenneth Michael Robinson, Washington, D. C., was on the briefs, for appellant.

Edward E. Schwab, Asst. Corp. Counsel, Washington, D. C., with whom Judith W.

---

3. *See* text, *supra* note 1.

Rogers, Corp. Counsel, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., were on the brief, for appellee.

Before GALLAGHER, HARRIS and MACK, Associate Judges.

MACK, Associate Judge:

Appellant/landlord was convicted of violating those sections of the Housing Code regulating the presence of lead paint in residential rental units. District of Columbia Housing Regulations §§ 1301, 2104, and 2605.4. In his defense he asserted that in lieu of correcting the violation, he had an option to evict the tenant and remove the premises from the rental housing market.[1] The trial court disagreed. On appeal he argues: 1) that the 1973 amendments to the Housing Code did not eliminate a then-existing option to vacate nonconforming property as a form of abatement of the violation; therefore he did not violate the regulations; 2) if the amendments eliminated that option, their enforcement is an unconstitutional taking of his property; 3) criminal enforcement of the regulations is unconstitutional under the void-for-vagueness doctrine. We do not find appellant's arguments persuasive and thus affirm.

## I.

The trial judge very ably set forth the relevant facts and law in this case. We approve and quote his Order in full.

### STATEMENT OF FACTS

On July 1, 1977, the District of Columbia Department of Housing and Community Development inspected 1213 Fourth Street, N.W., premises owned by Mr. Talley R. Holmes, Jr. Pursuant to such inspection a report was prepared delineating forty-two (42) items that had to be corrected because of excessive levels of toxic lead paint on the interior walls within such premises.

Notice of said violations was issued on July 20, 1977, and was received by the defendant, Mr. Talley Holmes, Jr., on or about July 27, 1977. The defendant was given fifteen (15) days from the date of service to correct the housing violations.

On August 1, 1977, the defendant gave the tenant of the premises notice to vacate within ninety (90) days because of the "lead poisoning problem".

On August 8, 1977, the defendant wrote the Department of Housing and Community Development requesting an extension of one hundred (100) days in order to comply with the notice of housing violations. In requesting the extension, the defendant indicated he intended to comply with the notice by vacating the premises within a ninety (90 to one hundred (100)) day period.

The Acting Deputy Administrator responded in a letter dated August 19, 1977, stating that these violations are "among the most serious which the Housing Regulation Division encounters in terms of their potentially devastating and fatal effects on the health and safety of small children . . . an extension would be inappropriate under the circumstances, and is therefore denied".

The District of Columbia Department of Housing and Community Development reinspected the premises on August 10, 1977, and again on August 29, 1977. On each occasion it was noted that lead paint violations had not been corrected.

The tenant subsequently vacated said premises, and the housing violations, as of December 5, 1977, remained unabated.

On October 11, 1977, the defendant Mr. Talley R. Holmes, Jr., was charged with violation of 2605 of the District of Columbia Housing Regulations as amended April 12, 1973.

---

[1] Appellant has previously come before us in similar circumstances. In *Holmes v. District of Columbia*, D.C.App., 354 A.2d 858 (1976), he had been convicted of violating the same regulations. There he also asserted that a landlord may evict a tenant in lieu of remedying the violation. We held that the issue was not properly raised because Holmes by his actions did not demonstrate a sincere intent to remove the rental unit from the market. In the instant case, this factual obstacle has been overcome to the limited extent that he actually ordered the tenant evicted.

## CONCLUSIONS OF LAW

In the instant case the defendant contends that a landlord may evict a tenant rather than make the repairs necessary to bring his premises into compliance with the Housing Code.

The court disagrees with the defendant's interpretation of the District of Columbia Housing Regulations, and concludes that no such option is available to the defendant.

Admittedly, prior to April 12, 1973, there was a provision in the housing regulations that permitted a landlord to terminate a tenant's occupancy of a premises where lead was found in sufficient quantity to constitute a health hazard to the occupant.

However, the option to vacate was removed when the housing regulations were amended on April 12, 1973. The removal of such option was apparently purposeful. Vice Chairman Sterling Tucker in a memorandum to the City Council stated: "the Committee is aware that there are thousands of dwelling units in the inner city which have exposed interior surfaces with lead above the permitted tolerances. By enacting this strict standard, it is not our intention to cause property owners to displace their tenants." *

■ Thus, it appears patently clear that the City Council in enacting the amendments of April 12, 1973, intended that landlords would be foreclosed from vacating premises where impermissible levels of toxic paint exists, and to require the abatement of the health hazard with the minimum of delay.

■ In the proceedings before the trial court, the defendant, in addition to raising the option issue, contended that the Housing Authorities failed to provide him with a reasonable period of time to make the necessary repairs to the premises. With regard to this issue the defendant at no time, during the pendency of the proceedings at the administrative level, requested or endeavored in anyway to enlarge the time for bringing the premises into compliance. Contrarily, his only application to the Housing Authorities was a letter dated August 8, 1977, seeking a one hundred (100) day extension so that compliance could be carried out by having the tenant vacate the premises.

Additionally, at the trial court level the defendant asserts that the bringing of the premises into compliance will be expensive and difficult. Of course, such reasons are insufficient to avoid compliance with required safety standards. *Levengard v. District of Columbia*, D.C.App., 254 A.2d 728 (1969); *Holmes v. District of Columbia*, D.C.App., 354 A.2d 858 (1976).

The burden on the defendant mandated by the housing authorities was the removal or adequate covering of lead paint in a single premises located at 1213 4th Street, N.W. The District of Columbia government estimated the cost to be $1,700. The defendant estimated the figure to be $2,000, and somewhat higher if he were unable to employ the use of his own repair personnel.

The record discloses the defendant was given fifteen (15) days from the date of service to correct the housing violations.

Further, no prosecution was instigated until October 11, 1977, when it became apparent that no action of a temporary or permanent nature was being undertaken by the defendant to correct the pending housing deficiencies.

In all, the defendant had more than seventy (70) days to remedy the housing violations. During this entire time the defendant had made no good faith effort to carry out what the law mandated him to do. Under the totality of the circumstances it cannot be concluded that the obligation placed upon the defendant, and the time period within which to do it was unreasonable. *Holmes v. District of Columbia, supra; Levengard v. District of Columbia, supra.*

---

* The Memorandum of Vice Chairman Sterling Tucker was incorporated into the minutes of the March 20, 1973, meeting of the City Council at which the first reading of the amended regulations occurred. The said amended housing regulations without further discussion passed unanimously.

Accordingly, the court finds the defendant guilty of the charges contained in the Information.

/s/ Fred L. McIntyre
FRED L. McINTYRE
Judge

## II.

■ The essence of appellant's due process claim is that to compel him to expend his resources to permanently remedy the violation, rather than remove the property from the market, is an unconstitutional taking; that construed in this manner, the regulations are unconstitutional. We are not presented with facts raising this issue. As we have said on a previous occasion on this subject:

[A] landlord may withdraw his units from the market where such action is based on purely economic considerations. *See, e.g., Robinson v. Diamond Housing Corporation,* 150 U.S.App.D.C. 17, 463 F.2d 853 (1972). However, the landlord's right to "abate by eviction" is not unfettered, and must be examined in light of the underlying policy of the housing code "to increase rather than decrease the stock of habitable housing in the District of Columbia." *Robinson v. Diamond Housing Corporation, supra* at 33, 463 F.2d at 869. The propriety of the withdrawal of noncomplying units would turn upon the difficult factual determination of whether the landlord was unable or merely unwilling to make the necessary repairs, and further would involve consideration of whether the eviction was based upon retaliatory motivations. [*Holmes v. District of Columbia, supra* at 859.]

Moreover, as appellant is aware, we have refused to overturn enforcement of the Housing Regulations "merely because [compliance] is expensive or difficult." *Levengard v. District of Columbia,* D.C.App., 254 A.2d 728, 729 (1969).

The facts here clearly indicate that appellant was *unwilling* to take any action to abate the violation short of eviction—this in the face of a clear emergency for the health and safety of the tenants. The discovery by the Housing Authority of the lead paint problem was triggered in this case by a referral from a Department of Human Resources clinic. The tenant's child had been found to have above-normal lead in her system. Thus at the time the landlord was notified of these violations, a serious health situation already existed. There were a number of steps appellant could have taken immediately. As the housing inspector testified:

Concerning the nature of the emergency, and the nature of the violations in this particular case, the majority of the violations were on wood trims, windows and doors, and they could have been covered temporarily with vinyl or paper or tape, and we would have gone along with Mr. Holmes had that been done and if it would have taken him longer to correct them in another fashion which he deemed appropriate.

There are things that he could have done within two weeks, or seven days, or twenty-four hours, had he decided to do those things  .  .  ..

.  .  .  .  .

[I]t was twenty days after the fifteen that we decided to refer the case for prosecution, so that's thirty-five days he had had time to get an estimate. If he had an estimate in hand, we would have strongly recomended these other alternatives  .  .  .  until such time as the contractor had started his contract.

Appellant did nothing other than give the tenant a 90-day notice to quit, and request a 100-day extension in order to comply by eviction—despite the emergency, despite the ready possibility of quick temporary resolution.[2] He has made no showing that he was unable to make the necessary repairs of either a temporary or permanent

2. Even assuming, arguendo, that appellant were truly *unable* to remedy the violation, we do not read D.C. Code, 1980 Supp., § 45–1699.6 as mandating 90-day notice. The situation is not specifically addressed by the provisions in subsection (b). Accordingly, the 30-day notice provision of subsection (c)(5) would appear applicable.

nature. He cannot now be heard to argue that the Constitution sanctions his failure to act.

Even if appellant were unable to take the remedial steps necessary to comply with the Housing Regulations, he could not prevail here. In the context of criminal enforcement, the fact that an injury may be ameliorated at some time in the future is immaterial. The issue at trial was whether appellant failed to correct the lead paint hazard within the requisite 15 days. He did not. Time was of the essence. The argument that the premises would be vacant within 90 days is irrelevant. Appellant was required to do something immediately. There is ample evidence in the record of temporary, inexpensive steps which could have been taken during the 15-day period. The defense of abatement by 90-day eviction is unavailable here.[3]

### III.

■ The thrust of appellant's contention that criminal enforcement of these regulations must fail under the void-for-vagueness doctrine is that compliance is a question of economics, dependent on weighing the value of the property against the cost of remedial efforts. He asserts that criminal prosecution for action or inaction based on such subjective financial determinations is "repugnant to due process of law." We do not accept this characterization of the regulations or their enforcement. Appellant was prosecuted for taking *no* action, temporary or permanent, in the face of clear notice of a serious violation. Housing Regulation 2605.4 requires

> The owner of a residential building shall maintain the interior surfaces of the building free of lead or lead in its compounds in any quantity of more than one milligram per square centimeter (1 mg/cm$^2$) or any quantity sufficient to constitute a hazard to the health of any inhabitant of, or visitor to, the building.

We think it obvious that the regulation gives notice of the conduct forbidden, with sufficient specificity to survive a void-for-vagueness challenge. *See Willcher v. United States,* D.C.App., 408 A.2d 67, 72–74 (1979).

*Affirmed.*

---

**3.** As indicated in *Holmes, supra,* where a landlord can demonstrate that he was economically unable to permanently rehabilitate the premises, the Constitution requires that he be allowed to remove the property from the market. But that issue is more properly raised in the context of an eviction proceeding. It is separate and distinct from the issue here of criminal liability for failure to take any protective steps in a lead poisoning emergency.